PAMI–LEMB I INC., PAMI–LEMB II Inc., PAMI–LEMB III Inc., PAMI–LEMB VI Inc., PAMI–CA3 Inc., PAMI–CA4 Inc., PAMI–FL1 Inc., PAMI–FL2 Inc., PAMI–FL4 Inc., PAMI–FL5 Inc., PAMI–FL6 Inc., PAMI–FL8 Inc., PAMI–FL10 Inc.,

---

15. *Lewis v. Anderson,* 477 A.2d 1040, 1046 (Del.1984).

16. *Id.* at 1045.

PAMI–FL11 Inc., PAMI–FL13 Inc., PAMI–FL15 Inc., PAMI–FL18 Inc., PAMI–FL16 Inc., PAMI–FL17 Inc., PAMI–FL9 Inc., PAMI–FL–LEMB V Inc., Plaintiffs/Counterclaim–Defendants,

v.

EMB–NHC, L.L.C., Defendant/Counterclaim–Plaintiff,

v.

Lehman Brothers Holdings Inc., Property Asset Management, Inc., PAMI–CA5 Inc., PAMI–CA6 Inc., PAMI–FL7 Inc., Additional Counterclaim–Defendants.

Civ. A. No. 259–N.

Court of Chancery of Delaware, New Castle County.

Submitted: May 6, 2004.
Decided: June 21, 2004.
Revised: June 22, 2004.

Samuel A. Nolen, Chad M. Shandler, Becky A. Allen, Richards, Layton & Finger, P.A., Wilmington, DE; Jonathan A. Abram, Audrey E. Moog, Lisa M. Cylus, Martin Alexander Price, Hogan & Hartson, L.L.P., Washington, DC, for Plain-

tiffs/Counterclaim–Defendants and Additional Counterclaim–Defendants.

Michael Hanrahan, Gary F. Traynor, Tanya P. Jefferis, Prickett, Jones & Elliott, P.A., Wilmington, DE, David J. Bradford, Terri L. Mascherin, Steven McMahon Zeller, Bradley P. Yusim, Jenner & Block, L.L.P., Chicago, IL, for Defendant/Counterclaim–Plaintiff, EMB–NHC, L.L.C.

## OPINION

LAMB, Vice Chancellor.

### I.

This is the court's opinion following an expedited trial held on April 15 and 16, 2004. The issues presented at trial relate both to the amended complaint and to the amended counterclaims in this matter.

This action arises out of a dispute between partners over the interpretation and enforcement of identical buy/sell provisions and related "waterfall" calculations governing the distribution of partnership proceeds in a series of partnership agreements. The partnerships were formed at various times from 1996 to 1999 to acquire, own and operate real property developed and used as recreational vehicle ("RV") or mobile home communities. A different, specially formed affiliate of Lehman Brothers, Inc. serves as both 1% general partner and a 74% limited partner of each partnership (collectively, the "PAMI Partners"). In each case, the other 25% limited partner is EMB/NHC, L.L.C. ("NHC"), a Delaware limited liability company owned and controlled by David Napp and Colleen Edwards. NHC manages the properties and is entitled to distributions on its 25% limited partnership interest only after Lehman receives a sizeable preferential return and the return of all its capital.

On January 8, 2004, NHC invoked the buy/sell provisions of the partnership agreements. According to the partner-ships' books and records, NHC's offer would have resulted in payments to Lehman aggregating approximately $70 million for its partnership interests. According to those same books and records, NHC's offer was also, in effect, an offer to sell its limited partnership interests to Lehman for $5.7 million.

The PAMI Partners responded on February 5, 2004, purportedly electing to be the buyer of the partnership properties but based on waterfall calculations predicated on books and records kept by Lehman that would result in a payment to NHC of no more than $1.5 million for its limited partnership interests. On February 9, 2004, NHC sent each of the PAMI Partners a letter setting forth its position that Lehman's election to buy was a counteroffer and therefore a repudiation of the partnership agreements. On February 17, 2004, NHC purported to close on its purchase and then "sold" the PAMI Partners' general and limited partnership interests to Manufactured Homes Communities, Inc. ("MHC"). MHC and NHC also entered into a joint venture and other contracts continuing NHC's management rights over the properties. Because Lehman refused to recognize NHC's right to act as buyer, the funds "due" to Lehman were placed in escrow.

On February 13, 2004, Lehman filed this lawsuit seeking an order compelling NHC to perform as seller under the buy/sell provisions. Lehman filed its first amended complaint on March 15, 2004, seeking specific performance of its right to be the buyer of the partnerships. Lehman asserts that its right to be the buyer pursuant to the buy/sell provisions of the partnership agreements is independent of which waterfall calculation is appropriate in determining the value of the partnerships. Lehman also alleges that NHC breached several provisions of the partnership agreements by not recognizing Leh-

man as the buyer and by purporting to transfer Lehman's partnership interests to MHC. Lehman further argues that NHC acted in bad faith and breached its fiduciary duties in its dealings with Lehman and its purported transfer of Lehman's partnership interests.

NHC counterclaimed, seeking a judgment that Lehman's response to the buy/sell notices constitutes a counteroffer or a repudiation of the contract.[1] NHC, therefore, seeks a declaration that its buy/sell election based on its offer price is valid and fully enforceable, thereby giving NHC the right to buy the PAMI Partners' interests in the limited partnerships. NHC further claims that Lehman breached its fiduciary duties in its dealings with the partnerships and acted in bad faith in its treatment of NHC.

For the reasons discussed in this opinion, the court concludes that NHC had the right to act as buyer and properly performed its obligations when it purported to buy Lehman's interests in the partnerships on February 17, 2004.

## II.

### A. *The Parties And Related Entities*

The PAMI Partners[2] are the plaintiffs in this action. Each is a corporation organized under the laws of Delaware and was created to serve as the general partner of a limited partnership (collectively, the "Limited Partnerships"), formed to acquire, own and operate real property developed and used as RV or mobile home communities. The Limited Partnerships[3] were each created pursuant to separate partnership agreements and at separate times. The PAMI Partners are owned by Property Asset Management, Inc. ("PAMI"), a Lehman company. Lehman's investment in the Limited Partnerships has been overseen from the beginning by Yon Cho, its employee who testified at trial.

Defendant NHC is a limited liability company organized under the laws of Delaware. The principals of NHC, Napp and Edwards, are the owners of Encore Communities, L.L.C., a non-party Delaware limited liability company that manages the day-to-day operations of the properties of the Limited Partnerships.

### B. *The Partnership Agreements*

The partnership agreements are governed by Delaware law and are valid and binding.[4] The agreements provide only one mechanism for disbursing cash to partners: through distributions pursuant to section 4.1. Section 4.1 provides that "Distributions of Available Cash from Operations shall be made once each calendar quarter and at such other times as the

1. NHC filed its second amended counterclaim for specific performance on April 12, 2004.

2. PAMI–LEMB I Inc., PAMI–LEMB II Inc., PAMI–LEMB III Inc., PAMI–LEMB VI Inc., PAMI–CA3 Inc., PAMI–CA4 Inc., PAMI–FL1 Inc., PAMI–FL2 Inc., PAMI–FL4 Inc., PAMI–FL5 Inc., PAMI–FL6 Inc., PAMI–FL8 Inc., PAMI–FL10 Inc., PAMI–FL11 Inc., PAMI–FL13 Inc., PAMI–FL15 Inc., PAMI–FL18 Inc., PAMI–FL16 Inc., PAMI–FL17 Inc., PAMI–FL9 Inc., and PAMI–FL–LEMB V Inc.

3. LEMB, L.P., LEMB II, L.P., LEMB III, L.P., LEMB V, L.P., LEMB VI, L.P., NHC–CA3 L.P., NHC–CA4 L.P., NHC–FL1 L.P., NHC–FL2 L.P., NHC–FL4 L.P., NHC–FL5 L.P., NHC–FL6 L.P., NHC–FL8 L.P., NHC–FL9 L.P., NHC–FL10 L.P., NHC–FL11 L.P., NHC–FL13 L.P., NHC–FL15 L.P., NHC–FL16 L.P., NHC–FL17 L.P., NHC–FL18 L.P., NHC–CA5 L.P., NHC–CA6 L.P., NHC–FL7 L.P.

4. The partnership agreements for the following partnerships were amended by a Letter Agreement dated March 2000: NHC–CA3 L.P., NHC–FL1 L.P., NHC–FL2 L.P., NHC–FL4 L.P., NHC–FL5 L.P., NHC–FL6 L.P., NHC–FL7 L.P., NHC–FL8 L.P., NHC–FL9 L.P., NHC–FL10 L.P., NHC–FL11 L.P., NHC–FL13 L.P., NHC–FL15 L.P., NHC–FL16 L.P., and NHC–FL17 L.P.

General Partner shall determine." Section 4.1 requires "prompt" distribution of capital transaction proceeds. It requires that distributions from either available cash or capital transaction proceeds be distributed through a "waterfall" calculation:

(a) First, to the Partners on a pro rata basis in proportion to their respective Capital Contribution Accounts until they have received an amount equal to the excess, if any, of (i) the 15% Preferred Return on their Capital Contributions over (ii) the sum of all prior distributions made pursuant to this subsection [(hereinafter "Preferred Return Account")];

(b) Second, to those Partners who as of the date of such distribution have positive Capital Contribution Accounts on a pro rata basis in proportion to their respective Capital Contribution Accounts, until each such Partner's Capital Contribution Account has been reduced to zero; and

(c) Third, the remainder, if any, to the Partners on a pro rata basis in proportion to their respective Percentage Interests.

Lehman and NHC agreed in 2000 to reduce the percentage of preferred return under section 4.1(a) of the partnership agreements from 15% to 13.5%. Section 9.2(d) of each partnership agreement provides that "Each Partner shall look solely to the assets of the Partnership for all distributions that such Partner may be entitled to under this Agreement...."

## C. *The Partnerships Are Not Consolidated*

Each partnership agreement provides for a separate "single purpose entity" partnership, and requires that each partnership operate as a stand-alone entity. As reflected in the partnership agreements,

including sections 9.2(d) and, most notably, 11.14, each partnership is a separate legal entity. Under section 11.14(a)(i) of each agreement,[5] each partnership must "maintain its own separate, complete and accurate accounts, books, records and financial statements complying with generally accepted accounting principles" ("GAAP"). Moreover, the loan agreements between the partnerships and third-party lenders, as well as with Lehman entities, also require that each partnership operate as a stand-alone entity, and not engage in any commingling of funds or loans to affiliates.[6]

Lehman contends that, notwithstanding the separate structures of the partnerships, the waterfall calculations at issue in this case should be performed on a consolidated basis. The point is important because the sale prices of certain of the partnerships are insufficient for Lehman to recover its preferred return on capital invested in those partnerships. With consolidation, Lehman would recover those deficits out of the sale price of some other more profitable partnership. In other words, without consolidation, there is no opportunity for Lehman to make good on its losses in one partnership from the profits realized in another.

While Lehman unquestionably regarded the partnerships, collectively, as a single business portfolio, the question is whether the partners ever agreed that the waterfall calculations would be done on a consolidated basis. Viewing the record as a whole, the court concludes that it does not contain substantial evidence of an *agreement* to treat the partnerships as a single, consolidated entity for any purpose, including, in particular, the waterfall calculation. Cho testified that there was an "understanding" to that effect, but provided no details of how it was reached.[7] He also attributed

---

5. Section 11.14(a)(iv) for the amended partnership agreements.

6. *See* DX 4 (various Mortgage and Security Agreements of the partnerships).

7. Trial Tr. at 92–93.

the absence of any such written agreement to an error or omission on Lehman's part. Yet, Cho admitted that the governing written documents—the partnership agreements—do not provide for consolidation. Edwards and Napp both testified credibly that there never was such an agreement.[8]

In 2003, the parties discussed consolidating all the partnerships under a "Master LLC."[9] In a memorandum outlining the proposed structure of the Master LLC, Lehman's counsel opined that if the partnerships were so consolidated operations would remain the same "except that the economics of the existing partnerships would be combined and netted for purposes of determining capital funding requirements and the distribution waterfall."[10] The Master LLC agreement was never negotiated or executed.

Edwards and Napp testified that initially when individual partnership properties were sold Lehman paid NHC distributions from the sale proceeds. Later, Lehman took the position in connection with other sales or refinancings that NHC was not entitled to any distribution because the partnerships should be treated on a consolidated basis and Lehman had not yet recovered its preferred return and equity on all the partnerships. Edwards and Napp objected to Lehman's refusal to allocate the distributions and approached Lehman's representative, Roland DiGasbarro, to complain.[11] Lehman continued to withhold the cash distributions although the partnership income related thereto was allocated to Edwards and Napp, and they

were required to pay taxes on that allocated income.[12]

Finally, it is undisputed that the partnerships are separate special purpose entities and have always had separate audited financial statements and separate tax returns.[13] Dr. James Adler, NHC's expert, testified that there is no evidence in the audit files to support a conclusion that the partnerships have been or should be treated as a single consolidated entity and that under GAAP the partnerships should be considered separate entities, consistent with the partnership agreements, tax returns, audited financial statements and loan documents.[14]

## D. *The Inter–Partnership Transfers Were Distributions And Contributions*

Lehman also contends that the waterfall calculation requires that all inter-partnership transfers be netted out, which has the effect of increasing the total amount payable to Lehman. NHC contends that the inter-partnership transfers have to be treated as distributions to the partners coupled with corresponding capital contributions. This issue also substantially affects the outcome of the waterfall calculations.

The evidence at trial showed that, from inception and at Lehman's general direction, there were transfers of funds from certain partnerships ("Distributing Partnerships") into other partnerships ("Recipient Partnerships"). Originally, those transfers were recorded as advances from,

8.  *Id.* at 259–60, 265, 509–10.

9.  *Id.* at 264–65, 519–20. *See* JX 78.

10.  JX 78.

11.  Trial Tr. at 260–62, 509–12.

12.  Napp and Edwards testified at length about four properties that were either sold or refinanced for which they received only a portion or none of the distributions of the cash proceeds they were entitled to as partners. *Id.* at 260–62, 431–37, 511–12, 533–36; *see also* Moore Dep. at 56–58.

13.  *See* Trial Tr. at 87, 266, 430, 451–52.

14.  *Id.* at 402–05.

and amounts due to, the various partnerships.

During the course of their audit of the partnerships' books for the year 2000, the partnerships' auditors, Barry & Moore, advised Edwards and Larry Teague, CFO of Encore, that it might not be possible for Barry & Moore to continue to issue "clean" financial statements for some of the partnerships because there was no reasonable likelihood that those advances would ever be repaid.[15] The auditors told Teague that it may be necessary to reclassify the transfers as distributions from and contributions to equity or risk a "going concern" issue that would likely violate the loan agreements.[16]

At the annual budget meeting held in Orlando, Florida in January 2001, Edwards informed Cho and DiGasbarro of the auditors' concerns and that she expected the auditors to recommend a reclassification or a different accounting treatment for the transfers.[17] Cho responded that Edwards should wait until the auditors reached their decision before taking any action.[18] Edwards and Napp both testified that later in 2001 they telephoned Cho and informed him that the auditors had recommended reclassifying the transfers as distributions from and contributions to equity in the various partnerships.[19] Edwards

explained to Cho that an alternative to changing the accounting for the transfers would be to infuse new capital into the partnerships to cover operating and capital expenditures. Cho responded that Lehman did not want to put in any new money and that Edwards should proceed with the reclassification.[20]

The change in accounting for the inter-partnership transfers was expressly disclosed on the partnerships' 2000 audited financial statements as a subsequent event, and was reflected in the audited financial statements of each of the partnerships from that year forward.[21] The treatment of the transfers as distributions and contributions also was reflected on the partnership tax returns and K–1s each year after the reclassification was made.[22]

After Lehman turned over responsibility for managing Lehman's investment in the partnerships from DiGasbarro to Joseph Kiely, Napp sent an email to Kiely explaining "as you know, at the end of the year any advances from a partnership with a positive cash flow ('Partnership A') to a partnership with a negative cash flow ('Partnership B') are characterized as a distribution from the Partnership A and a capital investment in Partnership B. We agreed that this is the proper treatment of the cash flow."[23] There is no evidence

15. *See id.* at 266–67, 271, 452–55, 499–500.

16. *See id.* at 453, 456–58. Dr. Adler testified that if the transfers had continued to be treated as receivables and payables, instead of distributions and contributions, that eventually GAAP would require that the auditors reduce the equity in the Distributing Partnerships and increase the equity in the Recipient Partnerships because there was no prospect that the loans would be repaid. *Id.* at 397.

17. JX 45 at PAMI–018–00547; Trial Tr. at 269–70.

18. Trial Tr. at 270–71.

19. *Id.* at 271–73, 500–01.

20. *Id.* at 271–73. Cho denied having any conversation with NHC regarding the reclassification of the inter-partnership transfers as distributions and contributions. *Id.* at 43–44. However, Cho admitted that Lehman or its agents received all of the tax returns and audited financial statements of the partnerships. *Id.* at 50–52. Moreover, the tax returns were only filed once Ernst & Young, Lehman's accountants, approved them after reviewing them for accuracy.

21. *Id.* at 458–59, 465–66. *See* DX 3.

22. *See* Moore Dep. at 35–36; JX 284.

23. JX 97.

that Lehman ever disagreed.

In addition, on January 30, 2003, David Goble of Trimont Real Estate Advisory, the asset manager of the NHC portfolio for the PAMI Partners, sent an email to Kiely (with a "cc" to Cho) stating that the partnerships were special purpose entities and that "there is no provision for loans between partnerships." [24] He noted that the repayment of funds needed to be recorded as a "return of *equity or preferred return.*" [25]

Based on all the evidence, the court concludes that Lehman was aware of and consented to the change in accounting treatment for the transfers made effective March 2001. [26] These transfers of funds were properly accounted for as distributions from and contributions to the equity in the various partnerships. According to section 4.1 of each partnership agreement, those distributions should have reduced the partners' preferred return account and then the partners' capital account, until those accounts were paid in full. The partnership books, including the audited financial statements and tax returns prepared by Barry & Moore and the equity ledgers maintained by the partnerships, accurately reflected the partners' preferred return balances and equity balances based on these distributions and contributions. [27]

The court is not persuaded by Lehman's contention that it is disadvantaged by the accounting for the transfers as distributions, or by its assertion that it would have made different economic decisions had it known of that accounting treatment. [28] First, the evidence demonstrates that Lehman did know that the transfers were accounted for as distributions. Second, Lehman was required to distribute excess cash from the Distributing Partnerships under section 4.1 of the partnership agreements. Lehman could not have those partnerships retain excess funds in order to generate a preferred return. Additionally, section 4.1 requires that distributions be applied first to reduce any accrued preferred returns and then to the capital accounts. Thus, Lehman had no choice under the partnership agreements other than to distribute excess cash and reduce any unpaid preferred return account.

For these reasons, the court finds that the distributions and contributions as shown in the partnerships' books and records must be taken into account in determining the waterfall calculations under section 4.1. [29]

24. JX 71. Kiely testified that NHC told him in February 2003 about its accounting treatment of the distributions and contributions. Trial Tr. at 631–32.

25. JX 71.

26. The Annual Reports prepared by Trimont for Lehman also informed Lehman regarding the amount of expenses that would be funded from cash flows of the partnerships. *See* JX 82.

27. Trial Tr. at 355–58.

28. The court does not credit Cho's assertion that Lehman would have sold the Recipient Partnerships if it had known that its investments in them were accounted for as capital contributions. *See id.* at 45–47. Approximately 17 of the partnerships at issue in this litigation from time to time received capital contributions from the cash flow of the distributing partnerships. *See* DX 15. While some capital contributions were necessary to fund off-season operational shortfalls, Napp testified that the vast majority of these capital contributions were used to fund capital improvement projects that added value to the underlying real estate. Trial Tr. at 571–75.

29. Lehman's expert, James Martin, testified that distributions and contributions should be treated as "liabilities" and excluded under the waterfall calculations. The court rejects this expert testimony because it is based on a faulty assumption, i.e., that the parties agreed to treat the partnerships on a consolidated basis for purposes of computing the waterfall under section 4.1. Moreover, Martin failed to account for these payments as liabilities in his

## E. *The Sales Effort*

Lehman began contemplating the sale of the PAMI partnerships as a portfolio (the "Encore portfolio")[30] in the summer of 2003. At that time, Lehman was acting as financial adviser to Sun Communities, Inc. ("Sun") in an effort to acquire Chateau Community, Inc., a portfolio of manufactured home communities that was being marketed by Goldman Sachs.[31] Another bidder acquired Chateau on terms that indicated to Lehman the existence of a favorable market for the sale of RV portfolios. In August 2003, Lehman assembled an investment banking team and started working with NHC to set up a process for the sale of the Encore portfolio.[32] Steven Hentschel, the same Lehman banker who advised Sun in the Chateau transaction, led the team.

Hentschel and his team first compiled a list of potential investors who had previously shown interest in buying similar portfolios.[33] Lehman, through Hentschel or another representative, directly contacted most of the potential buyers to determine their level of interest in acquiring the Encore portfolio. Eventually, only MHC and Sun expressed serious interest.[34]

MHC had shown interest in the Encore portfolio several times over the previous five years, contacting Cho directly to express that interest. Sun, by contrast, was not familiar with the Encore portfolio and first expressed an interest when Hentschel contacted Gary Schiffman, Sun's CEO, in July or August. Hentschel then contacted Howard Walker of MHC in September and met with Walker and Thomas Heneghan, MHC's CEO, soon thereafter. MHC indicated not only its interest in the Encore portfolio but also its desire to complete the transaction quickly in order to finalize a sale contract by its end-of-the-year board meeting, later set for December 11, 2003.

At the September meeting, Heneghan explained that MHC was in the process of a refinancing and wanted to use the cash proceeds for at least one of three possibilities: buy back stock; pay out a special dividend; or make acquisitions. Therefore, it was important to MHC in its capital planning to know the amount to allocate to potential acquisitions before its year-end board meeting. Hentschel viewed Heneghan's interest as a positive sign, but was not willing to negotiate a deal exclusively with MHC.

Hentschel's goal was, instead, to create a bidding contest between Sun and MHC. Since MHC was more familiar than Sun with the Encore portfolio, Hentschel needed to provide Sun with more information because he wanted to help Sun "catch up"

own waterfall analysis. He acknowledged in his report and deposition that under section 5.4(c), the starting point for a waterfall calculation is to reduce the offer price by the liabilities. At trial, however, Martin testified that the offer price should be reduced only for liabilities that encumber the partnership property. To the contrary, section 5.4 refers to liabilities without qualification. *Id.* at 341–47.

30. Since Encore manages the day-to-day operations of the properties, Lehman refers to the sale of the partnerships as "the Encore portfolio."

31. *See* Trial Tr. at 133–34.

32. The same team that worked on advising Sun on the Chateau transaction was brought together to work on marketing the Encore portfolio. *Id.* at 136.

33. There were approximately 18 persons or entities identified by Hentschel as potential buyers. JX 21; Trial Tr. at 136–173.

34. Lehman has business relationships with both Sun and affiliates of MHC. Although Lehman has not done business directly with MHC, it has worked with other companies owned by MHC's chairman and majority shareholder, Sam Zell. Trial Tr. at 56, 192.

to MHC in order to level the playing field. In late November, Hentschel gave Sun a draft of the offering memorandum and estimates of 2003 net operating income.[35] Hentschel also directed NHC to give Sun extensive information and to make its on-site managers available for site inspections. NHC points out that these actions were taken without a signed confidentiality agreement with Sun. NHC also suggests that Hentschel and Lehman improperly favored Sun because Lehman stood to earn substantial investment banking or other fees if Sun was the successful bidder.[36] By contrast, Hentschel admitted that he was trying to "stall" MHC and would not provide economic information to Heneghan without a signed confidentiality agreement.

Hentschel's stalling tactic was ineffective, however, perhaps because Napp was working closely with MHC during the sale process.[37] Lehman knew that Napp and Edwards were having contacts with the bidders and, indeed, understood that such contacts were important to the process because Napp and Edwards managed the properties. However, Napp and Edwards had a personal interest in seeing MHC succeed in purchasing the properties because they would be able to continue their involvement in managing the partnerships under MHC's ownership but not under Sun's. Hentschel expressed concern about the flow of information from Napp to MHC when he received MHC's draft letter of intent on December 3, 2003 containing detailed financial information that Lehman had not yet provided to MHC.[38] The following day, Hentschel sent MHC a confidentiality agreement followed by the offering memorandum and relevant economic information.

Hentschel considered MHC's December 3 offer "very aggressive" and acknowledged that Heneghan was "in a frenzy to buy" the properties.[39] Hentschel, however, persisted in his unwillingness to negotiate a deal directly with Heneghan and told MHC a "number of times" that "if they needed to drop out, so be it."[40] In contrast, Hentschel was encouraging Sun to do a deal quickly and told its representatives that Lehman wanted to get a hand-

---

**35.** Hentschel testified on cross-examination that he provided the economic information to Sun before it was provided to MHC. *Id.* at 224–25.

**36.** *See* JX 297. It was necessary for Sun to engage substantial investment banking services to modify its capital structure in order to make the purchase. JX 321; Trial Tr. at 241–45. Lehman negotiated extensively with Sun for investment banking business while concurrently negotiating the December 17, 2003 letter of intent and the February 9, 2004 sale contract. Trial Tr. at 248–50. Lehman was ultimately hired as the manager of a bond tender and will earn approximately $1.5 million in fees from the tender and a related interest rate hedge. *Id.* at 246–47. Furthermore, Hentschel testified that Lehman hoped to make approximately $4 million by providing commercial mortgage backed securities ("CMBS") to Sun. *Id.* at 248. Lehman made its CMBS proposal to Sun before it entered into a binding sale agreement with Sun and

before it responded to NHC's invocation of the buy/sell provisions. *Id.* at 249.

**37.** *See* JX 138; JX 145; Trial Tr. 179–80.

**38.** Upon receiving MHC's draft letter of intent, Hentschel sent an email to Cho and Kieley recommending that Napp be prohibited from communicating with MHC and complaining that Heneghan was "getting on his nerves" because he wanted to finalize a deal that week. JX 156; Trial Tr. at 119.

**39.** JX 165.

**40.** Trial Tr. at 226. When Heneghan told Hentschel he was sending MHC's CFO and General Counsel to New York and asked for a face-to-face meeting to negotiate a contract on Friday, December 5, Hentschel told them: "Don't come." When the CFO and General Counsel later went to New York, Hentschel refused to meet with them. Heneghan Dep. at 129–30; 178–79; 182–83.

shake deal on the sale of the properties by December 11, 2003.[41]

MHC submitted a revised proposal in a second letter of intent on December 8, 2003 at a price of over $210 million. Sun submitted a letter of intent the same day with no purchase price. At 6 p.m. that day, Heneghan called Hentschel and agreed to pay another $2 million. An hour later, Sun sent its letter of intent again, this time with a purchase price of $202.5 million.

At this point, Hentschel did not pursue the negotiation of a final contract with MHC, the apparent high bidder. Instead, because he claims to have thought that the two letters of intent were difficult to compare, since they had different terms and conditions, he asked Lehman's lawyers to prepare a form of sale contract and then asked MHC and Sun to submit a best and final offer on that form by December 15. Hentschel knew that this schedule was in conflict with MHC's December 11 board meeting and, in fact, after that meeting ended, MHC issued a press release announcing that it would not pursue any acquisitions and instead would issue a dividend to its shareholders. Hentschel testified that he called Heneghan for clarification of MHC's position but was told that Heneghan was not available.[42] Heneghan sent an email on December 15 to Hentschel stating that he would still "love" to discuss a deal but that MHC "no longer wanted to chase the transaction." [43]

Sun never submitted a bid response in the form of a proposed contract. Instead, Lehman permitted Sun to proceed on the basis of a letter of intent, which was executed on December 17, 2003.[44]

### F. NHC's Attempt To Make An Offer

Both Napp and Edwards testified at trial that Cho orally promised NHC a "right to match" any offer for the partnership interests [45] and that NHC tried to exercise this right after the Sun letter of intent was signed. Cho denied that he made any such promise and refused to sell to NHC. With reference to the section 5.4 buy/sell provisions, Cho testified that NHC "was not specifically allowed to be a bidder because [it] already had a preexisting right to make a bid for assets at any time." [46] Moreover, according to Cho, NHC could not have any other right to participate in the auction process as a buyer because other potential bidders would be disinclined to participate in the process if they thought they were bidding against management. Cho added that "NHC obviously had a right under the buy/sell agreement" to make an offer.[47] Although Napp and Edwards both testified credibly on this point, the absence of any writing memorializing the alleged agreement leaves the court unconvinced that Cho or Lehman ever agreed to give NHC the right to make a "last bid" other than the section 5.4 buy/sell mechanism. For reasons never explained at trial, notwithstanding NHC's written request, Lehman also refused to disclose the terms of the Sun letter of intent.[48]

### G. NHC's Buy/Sell Notices And Lehman's Response

On January 8, 2004, after being rebuffed by Cho, NHC invoked the buy/sell provi-

---

41. Colman Dep. at 68–69.

42. Trial Tr. at 201.

43. JX 191.

44. JX 195.

45. Trial Tr. at 283–84, 525.

46. *Id.* at 116.

47. *Id.*

48. *See* JX 211.

sion of each partnership agreement by issuing the notices prescribed by section 5.4(a) to each of the PAMI Partners (the "Buy/Sell Notices"). The aggregate purchase price was approximately $10.3 million more than the amount offered by Sun for the same interests. The waterfall provisions of section 4.1 are expressly incorporated in the buy/sell provisions of section 5.4 and form an integral part° of those provisions. The partnership agreements also contain other relevant terms and conditions which, with the buy/sell provisions, must be construed as a whole. Those provisions include section 9.2(d), which prohibits a partner from looking to any source other than the specific partnership for a return of its capital in the partnership, and section 11.14(a)(i), which requires the partnership to maintain accurate books and records in accordance with GAAP.

## H. *Lehman Books Were Inaccurate*

Trimont maintained partnership equity ledgers for Lehman (the "Lehman Ledgers") that did not reflect the disputed distributions and contributions. In addition, throughout Lehman's involvement in the partnerships, Lehman directed Trimont to account for distributions that it received as reductions of its capital instead of preferred returns.[49] Goble, on behalf of Trimont, acknowledged that the partnership agreements required that all distributions be booked first to preferred return, until all preferred returns had been paid.[50] However, Goble testified that when Lehman directed him to book a distribution in

a way other than what the partnership agreements required, he followed Lehman's instructions.[51]

Lehman knew, long before its election to be the buyer under the Buy/Sell Notices, that distributions should reduce the preferred return account under section 4.1 and that the Lehman Ledgers were therefore inaccurate. In response to an October 2003 email from Kiely inquiring about how the partnership agreements treated distributions, Lehman acknowledged that a "decision was made to 'follow' the partnership agreements with respect to distributions."[52] Kiely then confirmed on October 17, 2003, that Lehman had agreed to treat distributions as a reduction of accrued preferred return "since that's the deal we struck with [NHC]," but suggested that Lehman keep two sets of books.[53] Cho concurred.[54]

Kiely then concluded that Lehman would need to reconcile the Lehman Ledgers with the partnership books maintained by Encore[55] but that Lehman would nonetheless keep a separate set of books for its own internal purposes. Kiely effectively acknowledged that Lehman had improperly accounted for the disputed distributions and contributions stating: "[I]f the accounting had been done correctly in the first place ... [we] would have recorded all this ... the same way as [NHC] did," and that "[Lehman] would need to reconcile with [NHC] each month or at least quarterly...."[56]

---

**49.** *See* Goble Dep. at 181

**50.** *Id.* at 178–79, 182–83.

**51.** "[Y]ou've got to wonder who you're representing, the books or are you representing your client? If Lehman told us to do something otherwise, we have to agree to do it that way." *Id.* at 183.

**52.** JX 121; JX 122.

**53.** JX 125.

**54.** "I agree. Paydown of pref is fine." JX 126.

**55.** Martin testified that the "official" partnership records were those maintained by Encore and NHC. Trial Tr. at 354–55.

**56.** JX 16 at PAMI–10–1740.

On December 10, 2003, NHC sent Lehman an email showing the amounts that would be due to NHC under section 4.1 of the partnership agreements based on an anticipated purchase price of $213 million.[57] That calculation took into account the distributions, which reduced the preferred return accounts and reflected an aggregate allocation to NHC of $5.7 million.[58] The email put Lehman on further notice of the proper application of section 4.1 of the partnership agreements.

On December 18, 2003, Napp and Cho spoke and Cho agreed to make a reconciliation of the equity ledgers a priority to be completed in the first week of January.[59] Lehman, however, did not follow up on the reconciliation until it received the Buy/Sell Notices on January 8, 2004.

I. *The Reconciliation In Scottsdale*

Shortly thereafter, Lehman advised NHC it had engaged accountants to review the partnership books maintained by Encore in Scottsdale to reconcile the Lehman Ledgers. Lehman sent Martin to Scottsdale, ostensibly to reconcile the Lehman Ledgers to the partnership books. NHC gave Martin full access to all the books and records of the company. Lehman never disclosed to Napp or Edwards that its litigation counsel had hired Martin to perform this audit in anticipation of litigation with NHC.

In addition to failing to account for the disputed distributions and contributions, the Lehman Ledgers contained numerous errors that were brought to Lehman's attention. Douglas Swinford, the CFO of Encore after Teague resigned, testified that the Lehman Ledgers did not properly

account for distributions that had occurred upon the sale of two properties.[60] During the Scottsdale audit, Swinford identified $2.6 million in equity that Lehman had lost track of in its records.

Martin was able to reconcile the Lehman Ledgers to the partnership books and to the partnership audited financial statements and the tax returns. At the same time, Goble reviewed the partnerships' general ledgers and confirmed that the inter-entity distribution and contribution totals reflected on those other sources agreed with the general ledgers of each partnership. Donald Sklar, another accountant who was hired by litigation counsel to go to Scottsdale, testified that he was satisfied from Martin's reconciliation that he could rely upon the accuracy of Encore's or NHC's data with respect to the distributions and contributions.[61]

Martin reported to Lehman on January 26, 2004, that "by agreeing the audits to the tax return balance sheet, we have 'proved' that the tax returns are prepared from the audited balance sheets and income statements."[62] Martin also reported that he had identified all discrepancies between the Lehman Ledgers and the equity balance sheets in the partnership books, and he prepared a report of his reconciliation for Lehman.[63] Thus, Lehman was fully advised that the partnership books and records maintained by Encore were correct and consistent with GAAP and that the Lehman Ledgers were not accurate and not consistent with GAAP.

On January 27, 2003, while the Buy/Sell Notices were pending and after the reconciliation was complete, Lehman, at Cho's direction, sent its waterfall calculation to

57. JX 184.

58. Trial Tr. at 535–38.

59. *Id.* at 539.

60. *Id.* at 431–35.

61. *Id.* at 375.

62. JX 234.

63. *See* JX 69.

NHC. Both Cho and outside counsel for Lehman reviewed the calculations shortly before they were sent. Even though the equity ledgers had been reconciled, Goble used the materially inaccurate Lehman Ledgers to perform the waterfall calculations. Goble testified that his calculations were prepared because "Lehman wanted to negotiate a possible settlement." [64] When Goble sent the calculations to NHC, he stated: "[T]he recent reconciliation in Scottsdale was primarily for understanding the differences in book equity positions and *was never intended to verify and then restate Lehman equity positions.*" [65]

Additionally, Kiely, acting on Lehman's behalf, instructed Goble to use a 15% rate for preferred return for all time periods in his waterfall calculations, despite the October 31, 2000 agreement to reduce the preferred return to 13.5%. [66] Goble testified in his deposition taken weeks before trial that a Lehman representative instructed Trimont to change the Lehman Ledgers retroactively to apply a 15% return across the board. [67]

Based on all of the evidence, the court concludes that when Lehman sent its waterfall calculations to NHC on January 27, 2004, Lehman knew that the calculations did not reflect the partnership books and records and was not performed in accordance with the partnership agreements in at least the following ways: (1) it did not take into account the distributions and contributions reflected in the partnership books; (2) it did not follow the requirements of section 4.1 with respect to how distributions should reduce the preferred returns due to Lehman; (3) it did not include certain other distributions to Lehman from the prior sales of properties held by the partnerships; and (4) it did not apply the agreement by the partners to reduce the preferred return to 13.5%. The January 27 waterfall calculations did not even recognize the distributions and contributions as loans. Rather, the calculations ignored them altogether.

NHC promptly put Lehman on notice that, in refusing to accept the partnership books and records for purposes of responding to the Buy/Sell Notices, Lehman was not following the partnership agreements. On January 28, 2004, NHC sent Lehman an email confirming that the primary basis for the discrepancy between the Lehman Ledgers and the partnership books was Lehman's refusal to accept the historical accounting for distributions and contributions. [68]

On February 3, 2004, before Lehman responded to the Buy/Sell Notices, NHC further put Lehman on notice of the correct buy/sell price for NHC's interest based on the books and records of the partnerships by forwarding a detailed spreadsheet identifying the amount due to each partner from each partnership as contemplated by section 4.1 of the partnership agreements, as incorporated in section 5.4. [69] Lehman responded by stating that it viewed the partnerships as consolidated for purposes of determining the amount to be paid under the buy/sell provisions and section 4.1. Lehman also stated that, even if the partnerships were treated on an individual basis, Lehman would refuse to recognize the distributions and contributions and that, as the buyer, it would pay NHC no more than $1.5 million. The correct amount owed to NHC, if Lehman purchased the interests, was approximately $5.7 million.

---

**64.** Goble Dep. at 219.

**65.** JX 219.

**66.** Goble Dep. at 187–88, 214–15.

**67.** *Id.* at 93.

**68.** JX 226.

**69.** *See* DX 15.

Lehman told Napp that, if NHC did not accept approximately $1.5 million for its interests, Lehman would take the position that the partnerships were consolidated, litigate and assert that NHC was entitled to nothing. Lehman made clear that it "would pursue litigation if [NHC] did not accept [Lehman's] equity numbers," and that in litigation Lehman would assert that the number was zero.[70]

On February 5, 2004, Lehman sent a series of letters to NHC purporting to elect to be the buyer (the "Buy/Sell Responses"). In conjunction therewith, Cho reiterated to Napp that Lehman would not agree to perform the waterfall calculations in accordance with the partnership books and records; that Lehman would treat the partnerships as consolidated for purposes of those calculations; and that NHC would receive nothing for its interests.[71]

On February 9, 2004, NHC sent letters to Lehman as to each partnership, notifying Lehman that its Buy/Sell Responses were counteroffers and that Lehman's refusal to recognize the partnership books in connection with section 4.1 (as incorporated into section 5.4) was a material breach of the agreements. Lehman did not respond. On February 9, NHC paid the 5% deposit required for it to qualify as the buyer under the Buy/Sell Notices.

On February 10, 2004, NHC again put Lehman on notice that Lehman was in breach of sections 4.1, 9.2, and 11.14 of each partnership agreement in connection with its Buy/Sell Responses. Lehman did not respond to this letter other than to say, "there's no reason for us to talk."[72]

On February 11, 2004, NHC again wrote to Lehman, putting it on notice that it was in breach of the partnership agreements, but seeking an amicable resolution that would avoid protracted litigation. The next day, Cho sent Napp an email stating: "This will be fun!"[73] Lehman filed this lawsuit on February 13, 2004 and, as threatened, asserted that NHC is entitled to nothing for its partnership interests under the buy/sell provisions of the partnership agreements.

On or about February 17, 2004, NHC put in escrow the full purchase price for each of the partnerships. On March 4, 2004, Lehman asserted that NHC's payment was inadequate, based on its contention that the distributions and contributions should be ignored in computing the amount to be paid under sections 4.1 and 5.4. NHC thereafter posted $4.2 million, representing the additional amount that Lehman claimed was owed to it if NHC was the buyer.

## III.

The central issue in this case is whether, as a matter of contract law, NHC or Lehman is entitled to act as the buyer under the buy/sell provisions of the partnership agreements. For the reasons explained, *infra*, the court concludes that NHC has the contractual right to act as buyer, in accordance with its Buy/Sell Notices. The court finds that the totality of Lehman's response to the Buy/Sell Notices was so inconsistent with the clear terms of the partnership agreements it constitutes either a repudiation of those contracts or an improper counteroffer.

The court does not rest its conclusion on a finding of breach of fiduciary duty by Lehman, although there is evidence from which the court could infer that Lehman acted in breach of its duty of loyalty in its dealings with NHC and the partnerships. NHC made a choice in January 2004 to

---

70. Trial Tr. at 107–08.

71. *Id.* at 556–57.

72. *Id.* at 561.

73. JX 258.

rely upon its rights under the contracts, instead of bringing suit to complain about Lehman's fiduciary conduct. That choice has defined the relations of the parties in ways that ought to limit the scope of the court's analysis. For example, NHC relies upon its contract rights, and not any theory of breach of fiduciary duty, to justify its purported purchase of the PAMI Partners' interests and the substitution of MHC in their stead. In proceeding as it has done, NHC has fixed the price at which any transaction governed by the buy/sell provisions should take place. For these reasons, the court will not consider whether Lehman's conduct in the "auction" or otherwise could justify an equitable remedy allowing NHC (and MHC) to purchase the very assets they purport to own for less money than they purport to have paid.

A. *Lehman Repudiated The Contracts And Its Buy/Sell Responses Materially Varied The Terms Of NHC's Offer*

■ A repudiation of a contract is an outright refusal by a party to perform a contract or its conditions.[74] A statement of intent not to perform unless terms different from the original contract are met constitutes a repudiation.[75] A party repudiates a contract when it takes an action that constitutes a "significant and substantial alteration of both the present and the reasonably anticipated future relations created by [the] agreement."[76]

After NHC invoked the buy/sell provisions, Lehman repudiated the partnership agreements by stating unequivocally that it would perform only on terms different than those required by sections 4.1, 9.2(d) and 11.14 of those agreements. In doing so, Lehman unilaterally sought to alter both the present and reasonably anticipated future relations created by the partnership agreements and tried to use its superior economic power to impose a non-contractual understanding in lieu of the agreement between the parties. Lehman also breached the partnership agreements by refusing to make available to NHC the terms of the Sun letter of intent.[77]

While a party may theoretically choose to be the buyer in response to a buy/sell notice and nonetheless have a good faith dispute over the amount to be paid, Lehman did far more than that. Lehman insisted that NHC accept a dollar amount that it knew was contrary to the provisions of section 4.1 as incorporated in the buy/sell provisions of the partnership agreements, and that was contrary to the official books of the partnerships. Alternatively, Lehman threatened that it would litigate and assert that NHC was entitled to nothing. The court concludes that, because Lehman thereby repudiated the partnership agreements, it cannot enforce its election under section 5.4 to be the buyer. Once a party repudiates or breaches a

**74.** *CitiSteel USA, Inc. v. Connell Ltd. P'ship,* 758 A.2d 928, 931 (Del.2000).

**75.** *Id. See* 4 *Corbin on Contracts* § 973, at 911 (1967) (discussing how a "clear manifestation of intention not to perform in accordance with any other interpretation" other than that demanded amounts to a repudiation); *Pacific Coast Eng'g Co. v. Merritt–Chapman & Scott Corp.,* 411 F.2d 889, 895–96 (9th Cir.1969) (stating that repudiation occurs when a party is "not asserting a good faith interpretation of the contract terms" and has *"persistently* demanded an unwarranted condition precedent

to its required performance") (emphasis added).

**76.** *Bali v. Christiana Care Health Servs.,* 1998 WL 685380, at *1 (Del.Ch. Sept. 22, 1998).

**77.** *See Madison Ave. Inv. Partners, LLC v. America First Real Estate Inv. Partners, L.P.,* 806 A.2d 165, 173–74 (Del.Ch.2002) (holding that the limited partner had a statutory and contractual right to obtain documents reflecting the value of the partnership and the value of its investment).

contract, it cannot claim the benefits of that contract.[78] Therefore, because Lehman's response to the Buy/Sell Notices was invalid and improper, NHC has the right to be the buyer under the terms of section 5.4.

■ In addition, Lehman's Buy/Sell Responses, taken in the context of its contemporaneous statements to Napp, materially varied the terms of NHC's offer and, thus, were ineffective as elections to buy. In order to constitute an "acceptance," a response to an offer must be on identical terms as the offer and must be unconditional.[79] A response to an offer that is not on the terms set forth by the offeror constitutes a rejection of the original offer and a counteroffer.[80] The words and conduct of the response are to be interpreted in light of all the circumstances.[81]

NHC offered to buy the partnerships premised on a "hypothetical" sale price of $223 million, based upon the official books and records of the partnerships; to buy Lehman's equity interests for approximately $70 million; or sell its own equity interests for approximately $5.7 million. While purporting to accept, Lehman made clear that it would not abide by the explicit terms of the partnership agreements in determining what it was obligated to pay, would not recognize or base its payment on the partnerships own books and records, and would pay only $1.5 million for NHC's interests. If NHC refused to agree to these terms, Lehman threatened to litigate and assert that NHC was entitled to nothing. Lehman thereby rejected NHC's offer and made a counteroffer. By doing so, it terminated its power to accept.[82]

Section 5.4 contemplates that if the recipient of notice does not timely accept as the buyer, then the party giving the notice shall be the buyer. Because Lehman's counteroffer was not a valid acceptance as a buyer, NHC is the buyer under section 5.4. NHC timely and properly purchased Lehman's partnership interests on February 17, 2004.

B. *Alternatively, Lehman's Conduct Was In Breach Of The Implied Covenant Of Good Faith And Fair Dealing*

■ NHC also contends that Lehman's conduct amounts to a breach of the implied covenant of good faith and fair dealing engrafted upon every contract.[83]

78. *See Barra v. Adams*, 1994 WL 369532, at *4 (Del.Ch. July 1, 1994), *aff'd*, 655 A.2d 306 (Del.1995) ("Having unequivocally repudiated the June Agreement, the defendants cannot now be heard to claim its benefits."); *Capital Bakers, Inc. v. Leahy*, 178 A. 648, 650 (Del.Ch. 1935) ("[O]ne who himself has breached a contract has no standing in equity to compel the other party to perform it."); *CitiSteel*, 758 A.2d at 931 (discussing that unequivocal repudiation of contract relieves other contracting party from performance obligations).

79. *Friel v. Jones*, 206 A.2d 232, 233 (Del.Ch. 1964), *aff'd*, 212 A.2d 609 (Del.1965); Restatement (Second) of Contracts § 58 (1981) ("An acceptance must comply with the requirements of the offer as to the promise to be made or the performance to be rendered.").

80. *In re Estate of Messick*, 1989 WL 101866, at *3 (Del.Ch. Sept.5, 1989) (citing *Friel*, 206

A.2d at 233); Restatement (Second) of Contracts § 59 (1981) ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer."). *See* Restatement (Second) of Contracts § 39 (1981) (defining counteroffers).

81. Restatement (Second) of Contracts § 202 (1981).

82. *Friel*, 206 A.2d at 233; Restatement (Second) of Contracts § 39 cmt. a (1981).

83. *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1054 (Del.Ch.1984), *aff'd*, 575 A.2d 1131 (Del. 1990).

That implied covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract."[84] The implied covenant applies even where the contract allows a party to exercise discretion.[85]

■ A party may breach the implied covenant of good faith and fair dealing without violating an express term of the contract.[86] The implied covenant is "designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain."[87] This requires a court to extrapolate the "spirit" of the contract from its express terms, and "determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose."[88] For example, NHC argues that Lehman's conduct has undermined and frustrated the purpose of the buy/sell provisions to create a self-effectuating process for resolving ownership disputes without litigation. Since the court has already found that Lehman's conduct amounts to a repudiation of the partnership agreements, there is no reason to address this theory of liability. However, the court agrees with NHC that, if Lehman's conduct were not found to be in breach of a specific provision of the partnership agreements, it would be in breach of the implied covenant of good faith and fair dealing.

The court concludes that Lehman's course of conduct in responding to the Buy/Sell Notices was undertaken in bad faith and in knowing disregard of NHC's rights under the partnership agreements. Moreover, Lehman's conduct was designed to exert economic coercion on NHC, Napp and Edwards to force them to settle for a sum far lower than they were entitled to receive. This conduct was merely a continuation of an earlier pattern of economic duress practiced by Lehman in refusing to pay distributions that were owed to NHC pursuant to the terms of the partnership agreements while at the same time insisting that NHC's principals be responsible for paying taxes on the income represented thereby.[89]

### C. NHC Is Entitled To An Award Of Its Counsel Fees

■ Both NHC and Lehman seek costs and attorneys' fees incurred in this

---

84. *Wilgus v. Salt Pond. Inv. Co.*, 498 A.2d 151, 159 (Del.Ch.1985) (citing Restatement (Second) of Contracts § 205 (1981)), *overruled by statute on other grounds. See ACE & Co. v. Balfour Beatty PLC*, 148 F.Supp.2d 418, 426 (D.Del.2001).

85. *See Wilmington Leasing, Inc. v. Parrish Leasing Co., L.P.*, 1996 WL 560190, at *2 (Del.Ch. Sept. 25, 1996); *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.*, 1992 WL 181718, at *2 (Del.Ch. July 28, 1992), *rev'd and remanded on other grounds*, 624 A.2d 1199 (Del.1993).

86. *Chamison v. HealthTrust, Inc.*, 735 A.2d 912, 920 (Del.Ch.1999), *aff'd*, 748 A.2d 407 (Del.2000).

87. *Id.*

88. *Id.* at 920–21. *See Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del.Ch.1986).

89. As mentioned, NHC was entitled to receive distributions from the sale and refinancing of properties. Lehman further breached the partnership agreements by failing to pay those distributions. According to NHC, Lehman owes them the following distributions: $171,739 from the sale of the assets of NHC–CA5 Limited Partnership; $871,959.00 from the sale of the assets of NHC–CA6 Limited Partnership; $158,255.28 from the refinancing on property owned by NHC–FL7 Limited Partnership; and, $2,997.20 from refinancing on properties owned by NHC–FL11 Limited Partnership.

action based on section 8.3 of the partnership agreements. Section 8.3 provides that "if the Partnership or any Partner obtains a judgment against any other Partner by reason of breach of this Agreement or failure to comply with the provisions hereof, a reasonable attorneys' fee as fixed by the court shall be included in such judgment."

As already discussed, Lehman both breached and repudiated the partnership agreements. Therefore, NHC is entitled to an award of its reasonable attorneys' fees and costs pursuant to the terms of the parties' contract.[90]

## IV.

For all the foregoing reasons, and to the extent described, judgment shall be entered in favor of NHC and against Lehman. Counsel for NHC is directed to submit an appropriate form of order, on notice, within 7 days of the date hereof.

---

90. *See Citadel Holding Corp. v. Roven,* 603 A.2d 818, 824 (Del.1992) ("When construing a contract, and unless a contrary intent appears, we will give words their ordinary meaning.") (citation omitted); *Brandin v.*

*Gottlieb,* 2000 WL 1005954, at *28 (Del.Ch. July 13, 2000) (basing a determination of attorneys' fees and expenses on contractual provisions).