# COURT OF CHANCERY
# OF THE
# STATE OF DELAWARE

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

November 27, 2024

William B. Larson, Jr., Esquire
Manning Gross + Massenburg LLP
1007 N. Orange Street, Suite 711
Wilmington, Delaware 19801

Christine Thompson
30920 Snow Bunting Court
Millsboro, Delaware 19966

RE:  *Vicki Shaw and Michael Jeffery v. Christine Thompson,*
C.A. No. 2024-1039-LWW

Dear Counsel and Ms. Thompson:

This action concerns the defendant's refusal to abide by a contract to sell real estate.  The parties entered into an agreement for the sale of the defendant's home.  Just before closing and after the plaintiffs had sold their residence, the defendant tried to back out of the sale and refused to close.  The plaintiffs have since been living at a campground.  They seek specific performance to take title and possession of the home they contracted to buy.  After trial, I grant that relief.

## I. BACKGROUND

The following facts are drawn from the trial testimony, trial exhibits, or allegations in the plaintiffs' complaint that are deemed admitted due to the default judgment granted against the defendant.[1]

### A. The Property

Defendant Christine Thompson (the "Seller") is a Delaware resident. She owns and resides at 30920 Snow Bunting Court in Millsboro, Delaware (the "Property").[2]

Plaintiffs Vicki Shaw and Michael Jeffery (together, the "Buyers") are a married couple who were Maryland residents until recently. They frequently visited Southern Delaware on vacation.[3] In 2022, as their retirement neared, they set their sights on moving to the area.[4]

The Buyers looked at dozens of properties.[5] After two years of searching, Shaw saw the Property listing on Zillow.[6] The Property had been listed for sale on

---

[1] *See* Dkts. 25, 29. Trial testimony is cited as [Witness] Tr. __. Trial exhibits are cited as Trial Ex. __. Allegations in the complaint are cited as Compl. ¶ __. *See* Dkt. 1.

[2] Compl. ¶ 6.

[3] Shaw Tr. 7.

[4] *Id.* at 7.

[5] *Id.* at 10.

[6] *Id.* at 8.

April 29, 2024 at a price of $660,000.[7]  On or about August 12, 2024, it was relisted at a reduced price of $535,000.[8]  The new price placed the Property within the Buyers' target price range.[9]

The Property also satisfied the Buyers' wish list for a retirement home.  It is proximate to the Delaware beaches.  It is in an established community with built-in recreation, which was important to the Buyers' goal of staying active.[10]  It has ground-floor bedrooms and enough space to host the Buyers' children during visits.[11]  And it offers an attached garage, ample storage space (key for downsizing), plus an outdoor living space with a screened porch and patio.[12]

The Buyers toured the Property in August 2024.  It quickly became apparent that they had found their dream house.  Shaw was struck by the natural light, which was complemented by the open space and a wall of windows.[13]  The expansive kitchen offered the Buyers room to cook together—a pastime they enjoyed.[14]

---

[7] Williams Tr. 26.

[8] Compl. ¶ 12; Williams Tr. 26-27.

[9] Compl. ¶¶ 13-14; Shaw Tr. 7.

[10] Compl. ¶ 14; Shaw Tr. 8.

[11] Shaw Tr. 8.

[12] Compl. ¶ 14; Shaw Tr. 8.

[13] Shaw Tr. 8-9; Jeffery Tr. 21.

[14] Jeffery Tr. 21; Shaw Tr. 8-9.

During the tour, the Buyers met the Seller and her daughter.[15] Both enthusiastically encouraged the Buyers to make an offer on the Property.[16] The Seller expressed her need to sell the Property before she could move to a senior community in Maryland near her adult child.[17] The day after touring the Property and several other houses, the Buyers made an offer on the Property for the full listing price in cash.[18]

### B.     The Agreement

On August 17, 2024, the Buyers and Seller executed an Agreement of Sale for the Property (the "Agreement") at a price of $535,000.[19] Within five days of the Agreement's acceptance, the Buyers sent the Seller a $10,000 deposit check.[20]

The Agreement includes four contingencies: (1) a home inspection contingency; (2) a wood-destroying insect report contingency; (3) a radon contingency; and (4) a home sale contingency.[21] The parties agreed to release the

---

[15] Shaw Tr. 9-10.

[16] *Id.* at 10; Compl. ¶ 15.

[17] Compl. ¶ 16.

[18] Williams Tr. 27.

[19] Trial Ex. 1 (Agreement of Sale for the Delaware Residential Property).

[20] *Id.*

[21] Compl. ¶ 30; Trial Ex. 1.

first contingency through an addendum to the Agreement.[22]  The second and third contingencies were satisfied when the relevant inspections and resulting reports were provided to the Seller.[23]

The fourth contingency was met when the Buyers sold their home within the requisite period.[24]  Specifically, on September 2, 2024, the Buyers entered into a separate agreement of sale for their Maryland residence.[25]  The closing of that sale was scheduled for September 30.[26]

The Buyers were set to close on the Property on October 15.[27]  In the interim, they prepared for their move.  They purchased homeowner insurance for the Property and made appointments with contractors for carpeting, painting and fencing.[28]  They mapped out room designs and purged belongings that would not fit in their new home.[29]

---

[22] Compl. ¶ 31; Trial Ex. 2 (Addendum to Contract of Sale Continuation); *see* Shaw Tr. 14-15 (explaining that in lieu of repairs flagged during the home inspection, the Seller reduced the purchase price by $1,000).

[23] Compl. ¶¶ 32-33; Trial Ex. 7.

[24] Trial Ex. 2.

[25] Trial Ex. 6 (Maryland Residential Contract of Sale) 4.

[26] *Id.* at 2.

[27] Trial Ex. 9.

[28] Trial Ex. 7; Shaw Tr. 15.

[29] Compl. ¶ 24; Shaw Tr. 15.

### C.     The Purported Termination

On September 19, the Seller's real estate agent told the Buyers' agent by email that the Seller had "decided not to move forward with the sale of 30920 Snow Bunting Ct."[30]  The Seller refused to engage in any discussions about the sale.[31]  By this point, the Buyers were already under contract for the sale of their Maryland home.[32]

The Buyers attended the closing of the Property as scheduled on October 15, 2024.  The Seller did not attend.[33]

### D.     The Aftermath

After the sale of their Maryland home closed on September 30, the Buyers viewed themselves as homeless.[34]  They purchased a recreation vehicle so that they would have a place to stay.[35]  They continue to live in those close quarters, with their

---

[30] Trial Ex. 7.

[31] Trial Ex. 9.

[32] Trial Ex. 6.

[33] Shaw Tr. 17-18; Williams Tr. 32.

[34] Shaw Tr. 18.

[35] *Id.*; Jeffery Tr. 24.

two dogs.[36]  Their belongings, including winter clothes, are in storage.[37]  They continue to incur lodging and storage expenses.[38]

### E.     This Action

On October 10, the Buyers filed a complaint in this court seeking specific performance of the Agreement and incidental damages.[39]  They moved for expedited proceedings.[40]  I granted the motion and set trial for November.[41]  Despite having notice, the Seller did not appear at the motion to expedite hearing.[42]

On November 5, the Buyers filed a motion for a default judgment.[43]  I set a hearing on the motion for November 19—the same date that a half-day trial on the merits was scheduled.[44]  A pre-trial conference was held on November 15.  Despite having notice, the Seller again failed to appear.[45]  The Buyers filed their pre-trial

---

[36] Shaw Tr. 18.

[37] *Id.* at 18-19.

[38] Trial Ex. 5 (lodging and storage bills).

[39] Dkt. 1.

[40] Dkt. 2.

[41] *See* Dkts. 7, 13.

[42] *See* Dkt. 6.

[43] Dkt. 15.

[44] Dkt. 18.

[45] Dkt. 22.

brief on November 18 as ordered during a scheduling conference.[46]  The Seller did not file a brief.

Nor did the Seller respond to the default judgment motion or appear at trial. After the Buyers' counsel detailed his efforts to contact the Seller and represented that the Seller was aware of the proceeding, I granted a default judgment.  As a result of the default judgment, the allegations in the Complaint were deemed admitted.[47]

Trial proceeded.  The Buyers and their real estate agent testified live and trial exhibits were introduced.

At the conclusion of trial, I indicated that after hearing the evidence, I was inclined to grant specific performance.  I explained that a prompt written decision would follow.[48]

On November 25, the Seller's daughter emailed a court administrator about this proceeding.[49]  She explained that her mother had "cancel[ed] the contract"

---

[46] Dkt. 23.

[47] *See Stonington P'rs, Inc. v. Lernout & Hauspie Speech Prods., N.V.*, 2002 WL 31439767, at *3 (Del. Ch. Oct. 23, 2002) (citing Ch. Ct. R. 55(b)).

[48] Trial Tr. 37.

[49] Dkt. 28 (Notice of Ex Parte Submission).

through their realtor.[50]  She also expressed concern that her mother might be ordered to vacate the Property.[51]

## II.   ANALYSIS

The Buyers seek judgment under a breach of contract theory.  The primary relief sought is specific performance.  The Buyers also request an award of incidental damages incurred as a result of the Seller's breach and their fees and costs from this litigation.

### A.   Breach of Contract

To prove a breach of contract, the Buyers must demonstrate (1) the existence of a contract, (2) the breach of an obligation imposed by the contract, and (3) resulting damages.[52]  They have proved each element.

#### 1.   Enforceable Contract

A valid contract is formed when "(1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[53]

---

[50] *Id.*

[51] *Id.*

[52] *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009).

[53] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

The parties indicated their intention to be bound when they signed the Agreement. The terms of the Agreement were sufficiently definite and based on the standard contract for sale of residential real estate in Delaware.[54] And the parties exchanged legal consideration in the form of a promise to transfer property for an initial deposit (which the Buyers made) followed by payment in full.

### 2. Breach

The Seller repudiated the Agreement on September 19, 2024, when her realtor informed the Buyers' realtor that the Seller was canceling it.[55] There is no provision in the Agreement permitting the Seller to do so. The Seller then declined to attend the October 15 closing.[56] By refusing to transfer the Property by the deadline fixed by the Agreement, the Seller failed to hold up her end of the bargain.

### 3. Damages

The Buyers suffered harm because of the Seller's breach of the Agreement. They have been deprived of the chosen home they contracted to purchase. They sold their Maryland residence in reliance on the Agreement.[57] They have incurred

---

[54] *See* Williams Tr. 32; Trial Ex. 1.

[55] Trial Ex. 7; *see generally PAMI–LEMB I Inc. v. EMB–NHM, L.L.C.*, 857 A.2d 998, 1014 (Del. Ch. 2004) ("A repudiation of a contract is an outright refusal by a party to perform a contract or its conditions.") (citation omitted).

[56] Trial Ex. 9.

[57] Shaw Tr. 12-13.

storage fees for their belongings in the interim. Instead of preparing for holiday celebrations in their new home, they have been living in a recreation vehicle on a campground.

### B.    Specific Performance

The Buyers seek specific performance of the Agreement. They lack an adequate remedy at law.[58] The Agreement—a contract for the sale of real property—"is the quintessential contract for which specific performance is available."[59] "[S]pecific performance of a real estate sale contract is often the only adequate remedy for a breach by the seller, except in rare circumstances."[60]

To obtain specific performance, the Buyers must demonstrate by clear and convincing evidence that "(1) a valid contract exists, (2) [they are] ready, willing, and able to perform, and (3) that the balance of equities tips in favor of [the Buyers]."[61] Each of these elements was shown by the Buyers. The first element was addressed above. The remainder are considered below.

---

[58] *White v. Russell*, 2023 WL 3191746, at *7 (Del. Ch. May 2, 2023) (citing *Osborn*, 991 A.2d at 1158).

[59] *Morabito v. Harris*, 2001 WL 1269334, at *3 (Del. Ch. Oct. 10, 2001).

[60] *Szambelak v. Tsipouras*, 2007 WL 4179315, at *7 (Del. Ch. Nov. 19, 2007).

[61] *Osborn*, 991 A.2d at 1158.

1.    Ready, Willing, and Able to Perform

The Buyers stand ready, willing, and able to perform the Agreement.[62]  They possess the funds to purchase the Property after selling their Maryland residence.[63] They satisfied or waived all contingencies in the Agreement.[64]  They attended closing on October 15, 2024 and signed the required documents.[65]  They are simply waiting for the Seller to transfer title and vacate the Property as promised.

2.    Balance of the Equities

"In balancing the equities for specific performance, the Court must consider whether 'specific enforcement of a validly formed contract would cause even greater harm than it would prevent.'"[66]  "Equitable defenses are available to the breaching party, including an examination of the benefit which will accrue to the plaintiff upon consummation of the contract, the detriment to the defendant upon the same circumstance, and the conditions under which the defaulting party found itself in

---

[62] *Id.* at 1161; *see also Morabito*, 2001 WL 1269334, at *3 ("The plaintiff currently has a financing commitment in place and stands ready, willing and able to complete the purchase of the property.").

[63] Trial Ex. 6.

[64] *See supra* notes 21-26 and accompanying text.

[65] Trial Ex. 9.

[66] *White*, 2023 WL 3191746, at *7 (citing *Hastings Funeral Home, Inc. v. Hastings*, 2022 WL 16921785, at *8 (Del. Ch. Nov. 14, 2022)).

breach."[67]  This analysis "reflect[s] the traditional concern of a court of equity that its special processes not be used in a way that unjustifiably increases human suffering."[68]

The Buyers searched for a retirement home for two years.  Property near the Delaware beaches is expensive and real estate prices are high.  The Buyers' search led them to the Property when its reduced listing price placed it within their reach.  The Property is unique and satisfied the Buyers' wants and needs.

The Buyers satisfied all contingencies in the Agreement.  They put their Maryland residence up for sale, meeting the Agreement's home sale contingency.  It sold quickly.  Then the Seller repudiated the Agreement weeks before closing on the Property was scheduled.[69]  The Buyers have no permanent housing and now seek aid from the court.  They live in a state of turmoil, stress, and uncertainty.[70]

The Seller's story also appears to be a sad one.  It is not in the formal record since the Seller repeatedly failed to appear in this case and defaulted.  After trial,

---

[67] *Morabito*, 2001 WL 1269334, at *3.

[68] *Morabito v. Harris*, 2002 WL 550117, at *2 (Del. Ch. Mar. 26, 2002) (citation omitted); *see also Walton v. Beale*, 2006 WL 265489, at *7 (Del. Ch. Jan. 30, 2006), *aff'd*, 913 A.2d 569 (Del. 2006).

[69] *See* Shaw Tr. 18; Jeffery Tr. 24.

[70] Shaw Tr. 18; Jeffery Tr. 23-24.

however, her daughter emailed the court and explained that the Seller is elderly, in poor health, and lacks the funds to move.[71]

I have no reason to doubt these facts. To the extent I can fairly consider them, I weigh them as part of the equities before me. The Seller, too, risks being displaced from a home she wishes to live in.

At the same time, the Seller chose to put the Property on the market. This was not a flippant decision—it was listed for at least four months.[72] The Seller encouraged the Buyers to make an offer when they toured the Property.[73] She signed the Agreement, and there is no reason to believe that she was coerced or lacked awareness of her actions. The Seller was advised by a realtor.[74] She understood that she had signed an Agreement since she later attempted to terminate it.[75] While the buyers were at the Property for a home inspection, the Seller told them that she was happy they were buying her home and that they would enjoy living in it.[76] It seems that the Seller had a change of heart.

---

[71] Dkt. 28.

[72] Williams Tr. 26.

[73] Shaw Tr. 10.

[74] Williams Tr. 27-28.

[75] Shaw Tr. 16.

[76] *Id.* at 14.

Although the equities weigh heavy on both sides, they favor the Buyers on balance. I do not relish ordering the Seller to transfer title to her home. But that is the bargain she struck. Her actions have caused the Buyers to be without a permanent home themselves, after they sold their Maryland residence as the parties' Agreement contemplated.

The Seller has now had months to prepare to move. In my remarks after trial, I asked the Buyer's counsel to inform the Seller of the likely outcome of this case to give her further lead time. Her daughter's communication shows that this message was received. It is my sincere hope that the Property sale will alleviate the Seller's financial challenges. With luck, she and the Buyers will be settled in their new homes for the winter holidays.

### C.     Incidental Damages

The Buyers also seek the incidental damages to remedy costs they have incurred due to the Seller's breach of the Agreement. This court may "award damages or pecuniary compensation along with specific performance when the decree as awarded does not give complete and full relief."[77] "[E]quity had full

---

[77] *Tri State Mall Assocs. v. A. A. R. Realty Corp.*, 298 A.2d 368, 371 (Del. Ch. 1972) (citing Pomeroy, Equity Jurisprudence 5th ed. Vol. 5, s 237b).

jurisdiction, in addition to decreeing specific performance, to award such legal damages as may have resulted from the delay in performance."[78]

The home sale contingency in the Agreement made it reasonably foreseeable that the Seller's breach would leave the Buyers without a permanent residence and that they would incur temporary lodging expenses as a result.[79] The Buyers are currently staying at a campground, with fees ranging from $62.54 to $108.00 per night.[80] Their belongings are being stored for $600 per month.[81] As of this week, their lodging and storage costs total approximately $2,000.[82]

The Buyers are entitled to these costs as damages, since they result from the Seller's breach.[83] Specific performance alone will not cure them of these harms. The Buyers will be entitled to additional lodging and storage costs until title to the Property is transferred and the Buyers take possession.

---

[78] *Id*.

[79] Trial Ex. 2.

[80] Trial Ex. 5.

[81] *Id.*

[82] *Id.*

[83] I decline to award the costs of golf cart usage at the campground, however.

D. Attorneys' Fees

The Buyers also seek their attorneys' fees and expenses from this litigation. The Agreement includes a prevailing party provision.[84] It states that "[i]n the event a dispute arises under this Agreement between Seller and Buyers resulting in any litigation, and/or arbitration, Buyers or Seller, whichever is unsuccessful, shall also be liable for the other parties' court costs and attorney fees."[85] The Buyers have prevailed in this litigation. They are entitled to reasonable attorneys' fees and costs under the Agreement.

III. CONCLUSION

Judgment is entered for the Buyers. Specific performance is granted. The title of the Property must be transferred within 10 days of this decision, with the Buyers to be given possession of the Property at that time. Should the Seller refuse to transfer title by this deadline, the court will appoint a Special Magistrate for that purpose.[86]

Incidental damages and attorneys' fees and costs are also awarded to the Buyers, as outlined above. A total of $55,000 must be escrowed from closing to pay

---

[84] Trial Ex. 1 ¶ 27.

[85] *Id.*

[86] 10 *Del. C.* § 373 ("In all cases where the Court of Chancery orders the execution of any conveyance, assignment, release, acquittance or other instrument and the party against

these sums.  The Buyers' counsel is to submit an affidavit detailing the total damages,

fees, and costs after closing.  Upon further order of the court, the remaining escrow

balance will be returned to the Seller.

The Buyers' counsel is asked to ensure that a copy of this decision is delivered

to the Seller as soon as possible.

IT IS SO ORDERED.

---

whom the judgment is made does not comply therewith within the time mentioned in the judgment, the Court may appoint a Magistrate for such purpose.").