**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| PETER J. TREMATERRA, as trustee of the PETER J. TREMATERRA REV TRUST U/A/D 07-08-1988, and THE ESTATES OF WILDS PLANTATION, INC., | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| THE AFFINITY PROJECT, INC., | ) ) |
| Defendant. | ) ) ) |

C.A. No. 2025-0896-DH

## FINAL POST-TRIAL REPORT

Report: December 22, 2025
Date Submitted: December 8, 2025

Tyler Levengood, Joseph Crowley, and Samuel Gustafson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Plaintiffs Peter J. Trematerra, as Trustee of the Peter J. Trematerra Rev Trust U/A/D 07-08-1988 and The Estates of Wilds Plantation, Inc..*

Matthew W. Murphy, Zachary Greer, and Danielle Bell, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendant The Affinity Project.*

**HUME, IV, M.**

This Court has quoted John D. Rockefeller's famous saying, "a friendship founded on business is a good deal better than a business founded on friendship."[1] The conflict in this case results when individuals do not heed that sage advice. An investor who had a friendship with his financial advisor decided to invest $1.5 million in the advisor's brother's company. The brother touted the company's prospects, and the investor expected a return on his investment. The individuals mixed their personal and professional relationships, resulting in recriminations when communication broke down and the investor became dissatisfied with results. That leads us here.

## I.  BACKGROUND

The facts are drawn from the factual stipulations in the parties' pre-trial order, the testimony of Peter Trematerra ("Trematerra"), and the fifty-five joint trial exhibits.[2]

---

[1] *CertiSign Holding, Inc. v. Kulikovsky*, 2018 WL 2938311, at *1 (Del. Ch. Jun. 7, 2018) (citing JOHN D. ROCKEFELLER, RANDOM REMINISCENCES OF MEN AND EVENTS (1909) (noting that the quote was attributed to Rockefeller's business partner Henry Flagler)).

[2] Unless otherwise noted, pleadings are cited by reference to items docketed in C.A. No. 2025-0896-DH ("D.I."). Factual citations are to: the Pre-Trial Stipulation and Order, D.I.

Defendant The Affinity Project, Inc. ("TAP") was founded by its CEO, Ronald Suskind ("Ronald").[3] Defendant develops software.[4] Ronald's brother, Leonard Suskind ("Leonard"), was Trematerra's financial advisor at UBS Financial Services.[5] Leonard introduced Trematerra to Ronald.[6] Ronald informed Trematerra about TAP and its mission to create software to help children with autism.[7] Ronald proclaimed associations with well-known investors like former Secretary of Treasury Paul O'Neill and clothing designer Tommy Hilfiger.[8] Ronald told Trematerra that he was on the cusp of signing a deal with the Disney Corporation.[9] Plaintiff The Peter Trematerra Revocable Trust ("the Trust" or "Plaintiff")

---

45 ("PTO"); the Draft Trial Transcript ("Draft Tr."); and Joint Trial Exhibits (cited by "JX" number). At the time of this ruling, only the draft transcript has been prepared and citations to it refer to the rough copy of the transcript. Citations in the form of "POB" refer to Plaintiff's Pre-Trial Brief, D.I. 34. Citations in the form of "DOB" refer to Defendant's Opening Pre-Trial Brief, D.I. 35. Citations in the form of PAB refer to Plaintiff's Pre-Trial Answering Brief, D.I. 43. Citations in the form of DAB refer to Defendant's Answering Pre-Trial Brief, D.I. 44.

[3] PTO ¶ 6.

[4] *Id.*

[5] Draft Tr. 6:17-23.

[6] *Id.*

[7] *Id.* at 7:09-14.

[8] *Id.* at 9:20-10:06.

[9] The Disney deal was focused on a program called Sidekicks. Trematerra understood that some autistic children identify with Disney side characters instead of main characters, so the Sidekicks program would help them communicate via the side characters. Draft Tr. 9:06-13.

purchased 234,257 shares of Series A Preferred stock in Defendant for $4.2688 per share in August 2016.[10] The Series A Preferred Stock Agreement recognized that there was no public market for the shares.[11] Defendant had no obligation to redeem the stock.[12] Estates of Wilds Plantation, Inc. ("the Estates") purchased 105,263 shares of Series A-1 Preferred stock in Defendant for $4.75 per share in June 2017.[13] The Amended and Restated Investors' Rights Agreement for the Series A-1 stock restricted transfer of that series.[14] Trematerra is both Trustee of the Trust and President of the Estates.[15] Prior to commencement of this action, the Estates transferred its shares to the Trust.[16]

## A. Trematerra seeks return of Plaintiffs' investment

Post-investment, Trematerra grew increasingly frustrated with Ronald and his lack of communication. In February 2020, he sent multiple texts to Ronald wishing

---

[10] PTO ¶ 1; JX 15 at 7-31.

[11] JX 51 at 14, §3.5

[12] *Id.* at 5, §2.2(e).

[13] PTO ¶ 2; JX 15 at 7-31.

[14] JX 55 at 13, §2.12.

[15] PTO ¶ 3.

[16] JX 51; *see* Letter to Hon. David Hume, IV from Pl.'s counsel, D.I. 55.

to see the new platform.[17] When Ronald did not reply after five days, Trematerra

wrote:

> Ron I just sent you an email requesting a presentation for the third time if I do not hear from you by Friday March 6 let's make arrangements to have someone buy my investment. There is absolutely no reason why your assistant Natasha cannot call us to line a presentation up.[18]

Ronald extolled the business of TAP and its Bongo applications to Trematerra on

May 3:

> working on it now; we have an agreement for robust revenue from two of the country's premier hospitals -- America's #1, MGH and NYPresbyterian (the largest) -- of 50k a month for BongoFocus, and also an agreement for 50k/mo for BongoFocus sessions from a big private company that's leveraging growth in the pandemic. So money coming in, finally. I'm shaping the NYT story display our "authenticity" platform, and drive readers to it, in the story, itself; hoping for publication two weeks from now in the paper. Need to handle it with care; can't be rushed. Meantime, the heads of the two hospitals want to push our service across the network of U.S. healthcare, as soon as they receive the finished reports from us, with both qualitative and quantitative analysis, on what the doctor pairs are saying to each other on BongoFocus. Those reports, which need to comport with what's in the NYT, are being finished this week, right as the NYT edits the story. But, before the NYT appears, we need have packaged and ready a lite-lift, turnkey system for hospitals under stress. We're basically there -- that's what we've been doing that past two weeks. Designing the product. It scales. The NYT -- that I can control. Don't want to pull that trigger until we're ready to receive the wave.

---

[17] JX 11 at 3. I cite select text messages from JX 11 and JX 12 throughout this Memorandum Opinion. JX 11 and JX 12 contain additional text messages with representations that Ronald Suskind made about business that TAP conducted.

[18] JX 11 at 3.

We will be in a week. Then we can display the system and start taking on other hospitals. You can do the math, at 50/mo per hospital. I've tabled Bongotown feature development, scaling and go-to-market while we do this; should reactive it in a month. If I had another million, I'd reactivate that now. Can only do so much at once. BongoFocus has huge customers who are highly valuing the service and pressing us for use. They're first. Once that monthly revenue stream is established next month, we'll be ready for investment at a higher valuation and a possible partnership/sale.[19]

On December 15, 2020, Trematerra asked for "a copy of the 2020 financials" in a group chat with Ronald and Leonard.[20] Ronald replied that TAP Chief Financial Officer Dan Curtis ("Curtis") would call Trematerra that day.[21] In March 2021, Trematerra sent multiple messages in the group chat asking Ronald for updated financials for the year-to-date.[22] Ronald responded on April 7 that Trematerra would have the information "next week."[23] Trematerra replied on April 17, that he had not received the information.[24] Three and a half months later, Trematerra made yet another request for updated financial information.[25] He followed this with an

---

[19] JX 11 at 6.

[20] JX 10 at 2

[21] *Id.*

[22] *Id.* at 3.

[23] *Id.*

[24] *Id.*

[25] *Id.* at 4. It is unclear from the text messages whether Trematerra was still referring to his March request or whether this was a new request.

August 14 text message: "Ron; Please send me the future plan on what you are truly trying to accomplish.  It appears that your expenditures far exceeding your revenue where are we going."[26]  Ronald did not reply in the text message chain.  On September 5, Trematerra wrote, "Ron ; I have just sent an email to Mr. Dan Curtis although you have promised me an investor update letter I have not received it today if I cannot receive this information by close of business September 10 please return my investment immediately I have had enough[.]"[27]  Three days later, Ronald texted that they would do their best to return Trematerra's investment by the end of 2021 or sooner if they were able.[28]

But TAP did not return the investment.  Instead, Trematerra remained an investor and continued to request financial information.[29]  Ronald explained he had meetings with the CDC and discussions about bringing in a "top player from Google" to be chief operating officer.[30]  Trematerra reiterated a desire to sell his investment on December 23, 2022, in a text to Ronald and Leonard:

> Gentlemen, I was disappointed in your letter, Ron, as it appears to me that many things are up in the air, I would like to see the financials through November year to date. When I went into this, I was under the

---

[26] *Id.*

[27] *Id.* at 5.

[28] *Id.*

[29] *Id.* at 5-13; JX 11 at 12

[30] JX 11 at 12.

impression that this was to help autistic children. I have seen no evidence to date how this is helping the autistic community. I am going to give this to the end of March and if things are not proceeding with real true contracts, earnings, etc. I want to sell my investment, enough is enough. Also, when you were sending the financials, please list who the consumers are customers, etc. and old and any other pertinent information.[31]

Leonard told Trematerra that TAP was growing.[32] Ronald told Trematerra that the investment was worth 4 to 4.5 times (4x to 4.5x) what he paid, and would be going from 4x to 10x in 2024.[33] Trematerra was told that he could get his investment out in thirty days at a 10x profit or leave the money in TAP and expect a 100x return.[34] Defendant emailed Trematerra on December 27, 2024 that all shares of Defendant's stock were were valued at $4.75 per share, the value of the Series A-1 stock.[35]

## B. Tensions escalate between the parties

The December 27 valuation was the last straw. Plaintiff, via counsel, sent a letter to Defendant, addressed to Ronald and Leonard, on January 10, 2025.[36] The letter addressed purported misrepresentations made about Defendant's dealings by

---

[31] JX 10 at 10.

[32] Draft. Tr. 27:02-07.

[33] *Id.* at 28:01-16.

[34] *Id.*

[35] JX 15 at 29.

[36] JX 12.

Ronald and Leonard to Trematerra.[37]  Trematerra requested repayment of the greater

of his initial $1.5 million investment or the current value of his stock.[38]  Trematerra

threatened litigation in Federal court or by FINRA arbitration if Defendant did not

pay him for his stock.[39]  He also notified Defendant that he would be making a books

and records demand pursuant to 8 *Del. C.* § 220.[40]  On February 7, 2025, Defendant

offered to purchase Plaintiff's stock for $4.75 per share, the most recent price paid

by investors for Series A-1 Preferred stock.[41]  Trematerra followed through with his

Section 220 demand letter on March 4, 2025.[42]  Trematerra has neither filed suit

against Leonard nor made a FINRA complaint.[43]

### C. The Demands

The March 4 demand letter set forth three purposes.  First was to value

Plaintiff's investment.[44]  Second, to evaluate the February 7, 2025 offer to buy back

stock at $4.75 per share.[45]  Finally, to investigate whether representations Ronald

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] JX 14.

[42] JX 15.

[43] Draft Tr. 77:14-16.

[44] JX 15 at 2.

[45] *Id.*

9

made to Trematerra were true or not, and whether those representations were made to other stockholders.[46] The first demand requested twenty-five categories of documents.[47] Plaintiff followed this with a second demand on June 23, 2025.[48] This took place after Delaware counsel took over the case from Plaintiff's Florida counsel. The second demand alleged four purposes: (1) valuation of stockholders' shares; (2) evaluating the $4.75 per share buyback offer; (3) investigating "wrongdoing, mismanagement, and breaches of fiduciary duties arising out of the representations" that Ronald and others made to Trematerra, and whether those representations were made to other stockholders; and (4) "[d]etermination of the claims, if any, that should be pursued on behalf of the Company and/or its stockholders."[49] The second demand was accompanied by a request for twenty-five categories of documents.[50] The scope of documents requested remained the same as the first demand.

The parties communicated to resolve the demand. Defendants offered to produce the following documents from 2023 to the present (June, 12, 2025):

---

[46] *Id.*

[47] JX 15 at 4-6.

[48] JX 21.

[49] *Id.* at 4.

[50] *Id.* at 5-7.

- Current stock ledger;

- Federal and state tax returns;

- Monthly, quarterly and annual financial statements;

- Any valuations/appraisals;

- Forecasts/budgets/projections;

- Profit and loss statements; and

- A copy of the general ledger.[51]

The Plaintiff countered with a request to also include the unredacted capitalization table, copies of any contracts or agreements (including drafts) for the preceding three years where the Defendant might receive revenue, and a confidentiality agreement as proposed by Plaintiff's Florida counsel.[52] The confidentiality agreement would prove to be impassable.

The parties have divergent perspectives on the confidentiality agreement.[53] Plaintiff contends that Defendant sought to shield non-party Leonard Suskind from separate liability because Defendant's redline would prevent Plaintiff from using any documents disclosed in any proceeding, even if the documents were sourced

---

[51] JX 22 at 10.

[52] *Id.* at 7.

[53] JX 23 is Plaintiff's redline confidentiality agreement; JX 26 is Defendant's redline.

11

independent of this case. By contrast, Defendant contends that Plaintiff has an ulterior motive and more importantly, an improper purpose, to obtain documents for a separate lawsuit against Leonard. Plaintiff's redline would allow it to use documents obtained from Defendant in proceedings against Leonard if those documents were also obtained from another source. After the parties were unable agree regarding confidentiality, Plaintiff filed a Verified Complaint on August 6, 2025.[54] The Court held a one-day trial on December 8, 2025.

## II. ANALYSIS

### A. Section 220 Form and Manner Requirements are Met

I must preliminarily consider whether Plaintiff's demand meets the form and manner requirements of Section 220(b)(1) and (b)(2)(6). It does. Each demand was made in writing, signed under oath, and sent by counsel accompanied by a power of attorney.[55] Each demand was served on Defendant's registered office in Delaware.[56] Each demand stated with particularity Plaintiff's purpose.[57] Defendant does not dispute that Plaintiff has satisfied these threshold requirements.

---

[54] JX 28.

[55] JX 15 and JX 21.

[56] *Id.*

[57] *Id.*

**B. Plaintiff's Valuation/Evaluation Purpose is a Proper Purpose**

Plaintiff argues companion purposes of valuing stockholders' shares and evaluating Defendant's offer to buy back stock at $4.75 per share.[58] I consider these related purposes together. A stockholder must demonstrate a proper purpose by a preponderance of the evidence.[59] "Valuation of a stockholder's investment in a corporation, particularly where the corporation is privately held, has long been recognized as a proper purpose under 8 *Del. C. §* 220."[60] Our Courts have appreciated the special challenge in valuing shares in a closely held corporation like Defendant:

> Because they do not receive the mandated, periodic disclosures associated with a publicly held corporation, minority shareholders in a privately held corporation face certain unique risks. Such shareholders may, therefore, have a legitimate need to inspect the corporation's books and records to value their investment, in order to decide whether to buy additional shares, sell their shares, or take some other action to protect their investment.[61]

---

[58] JX 21 at 4.

[59] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006) (quoting *Nodana Petroleum Corp. v. State ex rel. Brennan*, 123 A.2d 243, 246 (Del. 1956))

[60] *Woods Tr. of Avery L. Woods Tr. v. Sahara Enter., Inc.*, 238 A.3d 879, 890 (Del. Ch. 2020) (quoting *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 685 A.2d 702, 713 (Del. Ch. 1995), *aff'd*, 681 A.2d 1026 (Del. 1996)).

[61] *Id.* (quoting same).

"Section 220 does not require a stockholder to say why it seeks to value its shares."[62]

Defendant does not dispute that valuation is a proper purpose. Defendant disputes that valuation is Plaintiff's true purpose. It asserts that Plaintiff's true, improper purpose is to force Defendant to redeem Plaintiff's shares. Although Defendant's burden is not an impossible one, our courts have found that the stated purposes must be "so indefinite, doubtful, uncertain or vexatious as to warrant denial of the right to inspection."[63] This Court has found that:

> [t]his showing is not made where a secondary improper purpose exists. Instead, in order to succeed, the defendant must prove that the plaintiff pursued its claim under false pretenses, and its primary purpose is indeed improper. Such a showing is fact intensive and difficult to establish; however, "our courts have evidenced a somewhat greater willingness to scrutinize the credibility of the stated purpose when the stockholder's demand is for books and records rather than merely for a stockholder's list."[64]

Defendant focuses on the period around the January 10, 2025 letter that Trematerra's Florida counsel sent to Ronald and Leonard requesting that Defendant repurchase Plaintiff's shares at the greater of $1.5 million or present share value.[65] Indeed, Defendants wrote that, "[i]n November 2024, Trematerra began to express

---

[62] *Woods Tr.* at 893.

[63] *Compaq Computer Corp. v. Horton*, 631 A.2d 1, 5 (Del. 1993).

[64] *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007) (internal citations omitted).

[65] JX 12.

14

his desire to exit his investment and requested information concerning the value of Plaintiffs' shares."[66]  Not so.  Trematerra asked for financial documents on December 15, 2020.[67]  On August 14, 2021, he wrote in the group text to Ronald and Leonard, "Ron; Please send me the future plan on what you are truly trying to accomplish.  It appears your expenditures far exceeding your revenue where are we going."[68]  Trematerra was not trying to divest.  He was trying to maximize the profit from his investment.  But the text messages show a constant struggle to obtain information explaining how Defendant planned to increase value.  Trematerra explained his frustration with Defendant's inability to provide timely financial information in the September 5, 2021, group text:

> Ron ; I have just sent an email to Mr. Dan Curtis although you have promised me an investor update letter *I have not received it *as of today if I cannot receive this information by close of business September 10 please return my investment immediately I have had enough[69]

This, not 2024, was the first time in the communications before me that Trematerra sought return of his investment.  In response, Ronald told him that they would do

---

[66] DOB at 6.

[67] JX 10 at 2

[68] *Id.* at 4.

[69] *Id.* at 5.

their best to return his investment "by the end of 2021 and sooner if we are able."[70] But Trematerra was not divested by the end of 2021. He remained an investor in the company but continued to attempt to value his investment. Trematerra's text to the group chat on December 23, 2022 is evidence of this.[71] There he sought financial records and agreed to wait until March 2023 to determine whether Defendant was moving in a profitable direction.[72] Trematerra wished to sell Plaintiff's investment back to Defendant only after repetitive delay and frustration in obtaining financial records to show the value of the investment and direction of the Defendant.

Concurrent with the valuation purpose is Plaintiff's evaluation purpose. On December 23, 2024, Trematerra emailed Ronald requesting initial and current valuation of his shares.[73] On December 27, Curtis responded that the shares would "informally be 'valued' at the Series A-1 price."[74] That value would be $4.75 per share. Defendant made a buyback offer of $4.75 per share to Plaintiff on February 7, 2025.[75] Plaintiff counteroffered at five times (5x) the initial value.[76] Defendant

---

[70] *Id.* at 5.

[71] *Id.* at 10; *see supra* at 6.

[72] JX 10 at 10.

[73] JX 15 at 31.

[74] *Id.* at 30.; $4.75 per share.

[75] JX 14 at 1.

[76] Draft Tr. 111:12-115:08.

argues that under basic contract principles, the counteroffer acted as a rejection of the offer and Plaintiff had no further need to evaluate the offer since there no longer was an offer. Defendant is correct that there was no offer pending after the counteroffer.[77] That does not foreclose Plaintiff's ability to evaluate the offer. This Court has previously rejected the concept that a Plaintiff must have "a present intention to sell" or "some other actual need" to justify valuation of a stockholder's shares.[78] As Plaintiff notes, the counteroffer did not end possible future negotiations and did not end the possibility of sale to a third party, even if it would require Defendant's consent.[79] It was also reasonable in light of the chasm between the Defendant's $4.75 per share offer and Plaintiff's counteroffer at 5x that amount for Plaintiff to reassess the counteroffer and, perhaps, make a new offer.[80]

The January 10 letter was not a lever that Trematerra used to force a buyback. The communications between Trematerra and Ronald show that Trematerra attempted to value his investment years before the January 10, 2025 letter. Valuation

---

[77] "A purported acceptance that is not identical 'constitutes a rejection of the original offer and a counteroffer.'" *Brady v. Huber*, 2023 WL 3736371, at *5 (Del. Ch. May 31, 2023) (quoting *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1015 (Del. Ch. 2004)).

[78] *Macklowe v. Planet Hollywood, Inc.* 1994 WL 560804, at *4 (Del. Ch. Sept. 29, 1994).

[79] *See* PAB at 17.

[80] *See Macklowe v. Planet Hollywood, Inc.* 1994 WL 560804, at *4) (Del. Ch. Sept. 29, 1994) ("There is no requirement that [a stockholder] must, in addition [to stating a valuation purpose], have taken concrete steps to sell her shares in order to rely upon that purpose as a basis for seeking inspection under § 220.").

of the shares and evaluation of a potential sale were Plaintiff's primary and valid purposes. It desired a buyout but that was collateral to his years-long attempt to value the investment.

### C. Plaintiff's Investigatory/Determination Purpose is not a Proper Purpose.

Plaintiff alleges two additional related purposes in its second demand:

- Investigation of wrongdoing, mismanagement, and breaches of fiduciary duties arising out of the representations made to Mr. Trematerra by, among others, the Company's founder and CEO, Ron Suskind ("Mr. Suskind")—and whether those representations were made to other Company stockholders; and
- Determination of the claims, if any, that should be pursued on behalf of the Company and/or its stockholders.[81]

These demands are related, so I address them jointly. "It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'"[82] The standard applied to Plaintiff's allegation is whether there is a credible basis from which the Court can infer wrongdoing or mismanagement.[83] This is the "lowest possible burden of proof" but it is greater than mere suspicion.[84] This Court's decision in *Amerisourcebergen* provides clear guidance for the credible

---

[81] JX 21 at 4.

[82] *Seinfeld*, 909 A.2d at 121.

[83] *Id.* at 118; *Simeone v. Walt Disney Co.*, 302 A.3d 956, 968 (Del. Ch. 2023) (quoting *Amerisource Bergen Corp. v. Lebanon Cnty Emps.' Ret. Fund*, 243 A.3d 417, 426 (Del. 2020) (citations omitted)).

[84] *Seinfeld*, 909 A.2d at 123.

basis standard when investigating possibilities of wrongdoing.[85] There, to substantiate investigation of the books and records, the plaintiffs could point to a "flood of government investigations and lawsuits" related to defendant's opioid distribution practices, reports by multiple state attorneys general identifying potential wrongdoing, and "significant corporate trauma," namely an offer to settle Multidistrict Litigation for approximately $10 billion.[86] While such evidence did not establish Defendant's liability, *Amerisourcebergen* indicates that such scope and quality of evidence meets the credible basis standard demanded under Delaware's Section 220 standard.[87]

Because Plaintiff names breach of fiduciary duty as an underlying theory for alleged wrongdoing or mismanagement, the decision in *Haque v. Tesla Motors, Inc.* is equally instructive.[88] There, the stockholder initiated suit to compel production of Tesla's Books and Records based on an alleged credible basis to infer that Tesla "misled shareholders by misrepresenting the Company's" production capacity and

---

[85] 2020 WL 132752, at *9-11.

[86] *Id.* at *10.

[87] *See id.* at *11 ("Whether a corporation has engaged in this type of wrongdoing is a legitimate matter of concern that is reasonably related to the plaintiffs' interests as stockholders.").

[88] 2017 WL 448594 (Del. Ch. Feb. 2, 2017).

actual production numbers.[89]  The Court recognized that Delaware requires "more than a divergence between forward-looking statements and subsequent results," to allege a credible basis for mismanagement and wrongdoing.[90]  The *Haque* decision indicates that although a stockholder may present inferences to the Court of wrongdoing, the Court is under no obligation to credulously accept such inferences.[91]  *Haque* also stands for the proposition that a mere discrepancy between forward-looking statements and subsequently published financial statements does not alone provide a credible basis to infer wrongdoing.[92]

This case lacks the substantive complaints, investigations, and lawsuits that permeated *Amerisourcebergen*.  Plaintiff argues that although Ronald and Leonard made representations about the Defendant's status and prospective deals for years, the value of Plaintiff's investment "has not appreciated *at all* in the *eight years* since the Estates invested."[93]  Ronald's text messages to Trematerra indicated ongoing discussions with various entities that would significantly increase TAP's value,

---

[89] *Id.* at *3.

[90] *Id.* at *5.

[91] *See id.* at *7 ("The inference that Haque would have the Court draw—that Tesla has the same convenient but false excuse stashed away each time it wants to hide demand issues at the end of the calendar year—does not flow logically from the evidence he presented at trial.").

[92] *See id.* at *11.

[93] POB at 23 (emphasis in original).

thereby ameliorating Defendant's financial position. They paint a rosy picture of Defendant's status and desirability of its products. But an optimistic outlook is not tantamount to wrongdoing. For instance, consider several text messages Ronald sent to Trematerra. On September 5, 2021, Ronald wrote:

> I spent the last two weeks in negotiations with two huge clients that will change the fortunes of the company. I delayed the letter until the deals are signed, or else I'd have to write a second one in mid- September. Let's talk tomorrow morning. I'll explain the particulars of what we're negotiating and what it'll mean for the company. I'm in the car from 10 to noon. I'll call then.[94]

This text details negotiations without confirmation of a finalized deal. This type of information is hopeful but hardly reliable enough to provide certainty to a reasonable investor. Ronald sent the following on May 2, 2022, at 5:34 p.m.:

> Peter — I'm on the road today and tomorrow, in and out of meetings. I'll try you on Wednesday, when I'm in LA with our client, the Los Angeles Times. We have large clients, major investors and potential buyers now in the mix. I'll fill you in when we speak.[95]

It discusses a client, the Los Angeles Times, but does not explain what quantity or quality of services Defendant provides to them. Ronald also discusses generally clients, investors, and buyers "in the mix." This is open to numerous interpretations. A stock value's failure to rise based on this information is not evidence of

---

[94] JX 10 at 5.

[95] *Id.* at 7.

21

wrongdoing or mismanagement. Ronald's messaging is equally consistent with the founder's continued efforts to obtain external funding and scale up the entity. Similarly, at 3:33 p.m. on August 25, 2022, Ronald wrote:

> I'm working on the letter now — just got our money from the new investor — but i want to wait until next Wed to send. We had our initial meeting with CDC senior staff on Monday. Went well. By next Wed, we'll have our second meeting (it'll be either Tuesday or Wednesday) with a CDC chief who, based on our first meeting, will likely be deciding about how they'll work with Bongo/NORC this fall. That's huge news that I'll want to drop into the letter.[96]

Here Ronald mentions a new investor without discussing the level of investment and comments on a meeting with a CDC representative, along with future meetings. His representations about the CDC staffer are glowing, but speculative. Even a more substantive text, like the May 3, 2020 offering discussed below does not provide a credible basis for alleged wrongdoing.[97] There, Ronald mentions "agreements" with two hospitals.[98] But agreements cannot be equated with finalized, signed deals in this context, especially where reports are still to be completed and revenue streams are not yet established.[99] Ronald tempers his positive outlook with Defendant's

---

[96] *Id.* at 8.

[97] JX 11 at 6. *See supra* at 5-6.

[98] JX 11 at 6.

[99] *Id.*

limitations and inability to scale due to lack of capital.[100] The circumstances presented to me are not sufficient to show evidence of potential wrongdoing. Ronald's enthusiastic representations are aspirational. He had high hopes for Defendant's business prospects, but they do not represent concrete promises.

Plaintiff's evidence of wrongdoing and mismanagement is Ronald's representations compared with the stock's purported value after eight years. Plaintiff's core argument is that if the stock did not increase in value, then it must be wrongdoing or mismanagement. This is mere suspicion and speculation. Plaintiff also cannot connect Ronald's representations with failure of Trust's investment to increase appreciably. Plaintiff's stock value, as assessed by the $4.75 per share repurchase offer,[101] did not decrease and the shares purchased by the Trust increased from $4.26 per share to $4.75 per share. There are equal, if not more, plausible explanations for failure of the stock valuation to increase. Plaintiff cannot show by a preponderance of the evidence that he has a credible basis to allege it was because of wrongdoing or mismanagement.

---

[100] *Id.* ("I've tabled Bongotown feature development, scaling and go-to-market while we do this; should reactive (sic) it in a month. If I had another million I'd reactivate that now.")

[101] JX 14.

Fatal to Plaintiff's argument is the consistency between TAP's distributed financial statements and the proposed stock buyback price of $4.75 per share. While Plaintiff may well lament his investment's failure to appreciate, he received unaudited corporate balance sheets for at least 2022-2024 that indicate the stagnancy of TAP's growth.[102] Plaintiff places weight on Ronald's aspirational representations while downplaying the corporation's published statements he was entitled to receive as a stockholder. In *Haque*, the unsuccessful plaintiff relied on alleged inconsistencies between Tesla's public statements and the subsequently published numbers.[103] Here, TAP's balance sheet appears consistent with the slight appreciation reflected in TAP's offer to buy out Plaintiff's investment.

Moreover, Plaintiff cannot demonstrate that Ronald's representations pressured him to maintain his investment in TAP because Plaintiff had no entitlement to redemption nor a private market where he could sell his shares. The Investors' Rights Agreement clearly specified that the stock "shall not be sold, pledged, or otherwise transferred" to comply with "the provisions of the Security Act."[104] Thus, although Plaintiff expressed the need to know "who has been

---

[102] *See* JX 6-8.

[103] 2017 WL 448594, at *7.

[104] JX 55 at 13, § 2.12.

harmed" as part of his investigatory purpose, Plaintiff fails to credibly allege a harm.[105]

Finally, permitting Plaintiff to investigate under these circumstances would yield unintended consequences. Corporations tout their goals, aspirations, and business objects in a positive light to their investors. Allowing a stockholder to seek books and records for an investigative purpose each time a company's proclamations did not result in an increased stock valuation that the stockholder feels is commensurate with the company's representations would throw the door open unreasonably wide to stockholder requests for books and records. A stockholder's right to investigate wrongdoing and mismanagement is vital, but not every unfulfilled corporate representation is wrongdoing or mismanagement.

## D. Scope of Documents for the Valuation Purpose

Once a proper purpose has been found, I must determine the scope of documents Plaintiff may inspect based on that purpose. Plaintiff requested twenty-five categories of documents:

1. The Company's stock ledger;
2. A complete record or list of the Company's stockholders, certified by its corporate secretary or transfer agent, showing for each stockholder, without limitation, the name, address, and number and type of shares owned;

---

[105] POB at 29.

3. Federal and State Corporate Income Tax Returns and supporting schedules for the three years preceding the date of this correspondence;
4. Annual financial statements for the three years preceding the date of this correspondence;
5. All valuations and appraisals of the Company and Company shares for the three years preceding the date of this correspondence;
6. All forecasts, budgets, and projections of the Company for the three years preceding the date of this correspondence;
7. All profit and loss statements for the Company for the three years preceding the date of this correspondence;
8. All general ledgers of the Company for the three years preceding the date of this correspondence;
9. Documents reflecting the Company's current assets and liabilities;
10. Documents reflecting applications for patents by the Company that are currently pending;
11. Agreements currently encumbering the Company's assets;
12. Marketing materials provided to prospective investors or lenders for the three years preceding the date of this correspondence;
13. Term sheets, offers, counter-offers, or contracts to purchase the Company or substantially all of its assets for the three years preceding the date of this correspondence;
14. Term sheets, offers, counter-offers, or contracts to invest in or loan to the Company for the three years preceding the date of this correspondence;
15. All Company transaction documents for completed financings for the three years preceding the date of this correspondence;
16. Offering memoranda, prospectuses, or private placement memorandums drafted or sent by the Company for the three years preceding the date of this correspondence;
17. The Company's current capitalization table;
18. The minutes of Board of Directors and stockholder meetings for the three years preceding the date of this correspondence;
19. All closing statements and purchase agreements related to all purchases of the Company's stock over the history of the Affinity Project;
20. Materials relating to, referring to, or constituting any proposal to purchase the Company's stock or to engage in any strategic transaction, whether such proposals were made by or directed to the Affinity Project;

21. Any valuation of the Company's assets for the three years preceding the date of this correspondence;

22. Materials relating or referring to any transactions involving the Company's stock, for the three years preceding the date of this correspondence, whether or not the Company was a party to such transaction;

23. All loan agreements, loan documents and payment schedules relating to any loans made to the Company for the three years preceding the date of this correspondence;

24. All contracts entered into by the Company and third-parties, pursuant to which the Company may receive revenue, for the three years preceding the date of this correspondence; and

25. Drafts of all contracts between the Company and third-parties, pursuant to which the Company may receive revenue, that were considered or proposed but not entered into for the three years preceding the date of this correspondence.

"Whether or not a particular document is essential to a given inspection purpose is fact specific and will necessarily depend on the context in which the shareholder's inspection demand arises."[106] Inspection orders must be circumscribed "with *rifled precision*."[107] Under section 220(a)(1)(a.)-(h.), books and records include:

a. The "certificate of incorporation," as defined in § 104 of this title, including a copy of any agreement or other instrument incorporated by reference in the certificate of incorporation.
b. The bylaws then in effect, including a copy of any agreement or other instrument incorporated by reference in the bylaws.

---

[106] *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 372 (Del. 2011).

[107] *Id.* (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 570 (Del. 1997) (alteration in original).

c. Minutes of all meetings of stockholders and the signed consents evidencing all action taken by stockholders without a meeting, in each case for the 3 years preceding the date of the demand under subsection (b) of this section.

d. All communications in writing or by electronic transmission to stockholders generally within the past 3 years preceding the date of the demand under subsection (b) of this section.

e. Minutes of any meeting of the board of directors or any committee of the board of directors and records of any action of the board of directors or any such committee.

f. Materials provided to the board of directors or any committee of the board of directors in connection with actions taken by the board of directors or any such committee.

g. Annual financial statements of the corporation for the 3 years preceding the date of the demand under subsection (b) of this section.

h. Any agreement entered into under § 122(18) of this title.[108]

Part of Plaintiff's requests fall under this preceding section and part are under section 220(g). The section 220(g) records may be produced only if the stockholder has shown a "compelling need" to further the proper purpose,[109] and the stockholder has demonstrated by "clear and convincing evidence that such specific records are necessary and essential to further" the proper purpose.[110]

Defendant argues that it has provided the information that Plaintiff requested because "the Company has routinely produced extensive financial documents to

---

[108] 85 Laws 2025, ch. 6, § 2.

[109] 8 Del. C. § 220(g)(2).

[110] 8 Del. C. § 220(g)(3).

Plaintiff for the past almost nine years, including quarterly financial statements, operating forecasts, and quarterly balance sheets."[111] The list provided showed sixty-five documents produced in 2016 and 2017, three in 2018, two in 2019, four in 2020, three in 2021, zero in 2022, three in 2023 (all on December 13, 2023), four in 2024, and zero in 2025. The list gives minimal explanation of the contents of each document. The three items provided on December 13, 2023 were listed as "Email-Update on Financial Stmts and New Investors", "The Affinity Project 2022 Fin Stmts", and "The Affinity Project Sept 2023 Fin Stmts."[112] The next apparent financial statements were provided on June 4, 2024: "The Affinity Project Dec 2023 Fin Stmts" and "The Affinity Project March 2024 Fin Stmts."[113] Defendant provided the last document (Sourcebase.ai Overview) on October 7, 2024. There seems to be little rhythm to what Defendant provided. Defendants have provided some documents, but the suggestion that it occurred with any regularity strains credulity. Although many documents were produced in first two years of investment, the flow slowed to a trickle. This is hardly an adequate basis for Plaintiff to value his stock in 2025.

---

[111] JX 46.

[112] *Id.* at 5.

[113] *Id.*

Defendant argues that a finding of proper purpose does not automatically entitle Plaintiff to all the books and records defined in section 220(a)(1). I agree. While section 220 allows stockholder access to books and records, it is not unrestrained.

Plaintiff seeks a valuation as of the date of demand. For purposes of valuing his stock, Plaintiff may inspect request (1), Defendant's stock ledger, under section 220(b)(1)(a). Plaintiff may inspect request (4), annual financial statements for the three years preceding the date of the demand, under section 220(a)(1)(g). I find no other Plaintiff's requests that fall under section 220(a)(1) and that relate to Plaintiff's valuation purpose. Plaintiff makes other requests that fall under section 220(g). I find that Plaintiff has made a compelling need to inspect the following and has shown by clear and convincing evidence that they are necessary and essential to value Plaintiff's investment:[114]

---

[114] I note that the recent amendment to § 220(g) displaced the "demonstrated need" standard of the *ancien regime* with "compelling need." *See Hightower v. SharpSpring, Inc.*, 2022 WL 3970155, at *9 (Del. Ch. Aug. 31, 2022); Michael Holmes, Jeffrey Crough & Meredith Lyons, *Recent Updates on Section 220 Demands: What Changed, What Hasn't, and How to Respond*, HARV. L. FORUM ON CORP. GOV. (Nov. 8, 2025), https://corpgov.law.harvard.edu/2025/11/08/recent-updates-on-section-220-demands-what-changed-what-hasnt-and-how-to-respond/#6b. The modifier "compelling" rachets up the standard that the stockholder must meet. The compelling need standard arises in Delaware's attorney work-product doctrine where a party may show "compelling need" to access materials not subject to absolute privilege but otherwise undiscoverable, e.g., an attorney's mental impressions. *See Tackett v. State Farm Fire and Cas. Ins. Co.*, 653 A.2d

- All Federal and state corporate income tax returns and supporting schedules for the three years preceding the demand. (Request (3)).

- All valuations and appraisals of the Defendant and its shares for the three years preceding the demand. (Request (5)).

- Documents reflecting the Defendant's current assets and liabilities. (Request (9)).

Many of the Plaintiff's requests relate to valuation, but they are duplicative. Plaintiff's request (6) for forecasts, projections, and budgets does not provide as specific information as the stock ledger, tax returns, and valuations and appraisals of the Defendant and its shares. For request (7), profit and loss statements, and (8), general ledgers, Plaintiff will receive that information in the annual financial statements and tax returns. Request (11), agreements encumbering the Defendant's assets, (15) documents for completed financings, (23) loan agreements, and (24)

---

254, 262 (Del. 1995) (applying the compelling need standard to order production of an attorney's opinion for how an insurer should handle a claim). Here, given Plaintiff's proper purpose to evaluate Defendant's offer to repurchase his shares for an amount considerably less than Plaintiff reasonably expected, Plaintiff has demonstrated a compelling need to access documents reflecting Defendant's appraisal of the stock. Plaintiff has also met his evidentiary burden to demonstrate three categories of records are necessary and essential to further his evaluation purpose. The 220(a)(1) records alone would provide an inadequate basis to value his shares and consequently evaluate Defendant's buyback offer. However, the "necessary and essential" standard demands that no more than what is sufficient to meet Plaintiff's proper purpose is subject to court-compelled production. Consequently, I have eliminated any duplicative documents.

contracts that provide revenue, will be shown in the Defendant's current assets and liabilities. Request (17), the current capitalization table, will be duplicated by the stock ledger. For the remaining categories, I do not find that Plaintiff has made out a compelling reason that it needs these items to arrive at a current stock valuation. Plaintiff has shown clear and convincing evidence of the need, and a compelling need, for the permitted valuation documents, so I have distilled from the voluminous requests the documents that will most effectively and precisely accomplish that mission.

### E. Confidentiality of the Books and Records

Both sides have asked the Court to address confidentiality. This deals mainly with non-party Leonard Suskind. I have gleaned from the evidence that Leonard was Trematerra's investment advisor at UBS and became friendly with him but made an "off the books" suggestion to invest in Ronald's company. At this point, Trematerra blames Leonard for involving him with Ronald and Defendant. Trematerra has not sued Leonard or referred him to FINRA.[115] I have granted Plaintiff's request for certain books and records to value its investment. If the records also show some wrongdoing, Plaintiff is not prohibited from using them for that purpose.

---

[115] Draft Tr. 77.

Leonard is a non-party to this action. Plaintiff is not prohibited from using records obtained from another source (that may be identical to those in this matter) in an action against Leonard. This is what the Plaintiff proposed to Defendant in pre-220 action negotiations. I see no reason to broadly prohibit Plaintiff from using documents in an action against Leonard if obtained from an independent source.

### F. Fee shifting

Both sides seek costs, including attorneys' fees. Delaware courts follow the American Rule, where the prevailing party ordinarily pays its own fees and costs.[116] The American Rule admits an exception in cases where a party engaged in bad faith conduct, such as unnecessarily prolonging litigation or "knowingly assert[ing] frivolous claims."[117] Invoking the bad faith exception is exceedingly rare, and this Court will only invoke it to "deter abusive litigation and to protect the integrity of the judicial process.[118] Court of Chancery Rule 54(d) awards costs "as of course to the prevailing party unless the Court otherwise directs."

---

[116] *Haywood v. Ambase Corp.*, 2005 WL 2130614, at *8 (Del. Ch. Aug. 22, 2005) (citing *Montgomery Cellular Holding. Co. v. Dobler*, 2005 WL 1936157, at *15 (Del. Aug. 1, 2005)).

[117] *Nagy v. Bistricer*, 770 A.2d 43, 64-5 (Del. Ch. 2000) (citing *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)).

[118] *Montgomery Cellular*, 2005 WL 1936157, at *15; *see Johnston*, 720 A.3d 542, 546 (applying the exception where defendants delayed litigation, brought frivolous motions, and falsified evidence).

I do not find that either party acted in bad faith. I have ruled that a portion of Plaintiff's purposes were proper. Defendant rightly opposed those that were not. There was personal animus between Trematerra and the Suskinds, but that on its own does not give rise to bad faith that would lead to fee shifting. Each side prevailed on portions of this case, so each side shall be responsible for its own costs and own attorneys' fees.

## III.   CONCLUSION

Plaintiff has a proper purpose of valuing his investment and evaluating a possible sale. He is entitled to categories of books and records as set forth in this opinion. I did not find a proper purpose for investigating wrongdoing or determining whether other stockholders were made representations like those made to Trematerra. Both sides are responsible for their respective fees and costs.